AMERICAN PROPERTIES, INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57748–57751. Filed August 30, 1957.

*Tracy Griffin, Esq.,* and *Kenneth P. Short, Esq.,* for the petitioners. *Gordon N. Cromwell, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and additions to the tax as follows:

---

[1] Proceedings of the following petitioners are consolidated herewith: American Properties, Inc., Docket No. 57748; Stanley S. Sayres, Docket No. 57749; Madeleine A. Sayres, Docket No. 57750; and Stanley S. Sayres and Madeleine A. Sayres, Docket No. 57751.

| Petitioner | Year ending | Deficiency | Sec. 293 (a) addition |
|---|---|---|---|
| Stanley S. Sayres | Oct. 31, 1948 | $1, 937. 39 | $96. 87 |
| Madeleine A. Sayres | Oct. 31, 1948 | 1, 906. 23 | 95. 31 |
| Stanley S. and Madeleine A. Sayres | { Oct. 31, 1949 | 10, 400. 69 | (1) |
| | { Oct. 31, 1950 | 12, 830. 51 | 641. 53 |
| American Properties, Inc. | { Dec. 31, 1949 | 495. 78 | (1) |
| | { Dec. 31, 1950 | 3, 601. 31 | (1) |

1 None.

American Properties, Inc., claims that there has been an overpayment in its tax for the year 1949.

The principal issue is whether certain expenditures made by the petitioner American Properties, Inc., in 1949 and 1950 in connection with designing, constructing, and racing of speed boats constituted deductible business expenses of the corporation, or whether such expenditures constituted personal hobby expenses paid by the corporation on behalf of its stockholder, the petitioner Stanley S. Sayres, taxable to him and his wife, the petitioner Madeleine A. Sayres, and nondeductible by the corporation.

A second issue relating to the individual petitioners for the years 1948 and 1950 concerns omissions of salary income of the petitioner Stanley S. Sayres and additions to the tax for negligence relating to omissions of salary income.

### FINDINGS OF FACT.

The petitioners Stanley S. Sayres and Madeleine A. Sayres are husband and wife, and the petitioner American Properties, Inc., is Stanley S. Sayres's wholly owned corporation. The individual petitioners reported their income on a fiscal year basis ending October 31. The corporation keeps its books and reports its income on a calendar year basis. The individuals filed separate income tax returns for the taxable year 1948 and filed joint returns for the taxable years 1949 and 1950.. These returns and the returns of the corporation for the years 1949 and 1950 were filed with the collector of internal revenue at Tacoma, Washington. The petitioner Stanley S. Sayres is referred to hereinafter as the petitioner, or as Sayres, and the petitioner American Properties, Inc., is sometimes referred to hereinafter by name or as the corporation.

### *Design, Construction, and Operation of Racing Boats Issues.*

Prior to 1931 the petitioner was engaged in the automobile business in Pendleton, Oregon. In that year he went to Seattle and purchased Williams Auto Company, a corporation, the name of which he changed to American Properties, Inc. (one of the petitioners herein). During the years in question he owned all the stock of the

corporation except a qualifying share, which was held by his attorney. The petitioner also purchased stock of American Automobile Company. During the years in question he was also the principal stockholder of that corporation. That company operated an automobile dealership and was a tenant of premises owned by American Properties, Inc.

The petitioner has always enjoyed speed and it had been his desire to drive a boat faster than anyone had ever done before. Prior to going to Seattle he had engaged in outboard motorboat racing.

After moving to Seattle the petitioner for several years did not engage in boat racing. However, at some time prior to 1948 he purchased a used racing boat which had previously attained a speed of 80 m. p. h., and he named it Slo-Mo-Shun. Thereafter he built successively Slo-Mo-Shun II and Slo-Mo-Shun III. In the design, construction, operation, and maintenance of Slo-Mo-Shun III, the petitioner retained technical assistance of experts who were recognized as outstanding in their fields. Since Ted Jones, the boat designer, was employed on a full-time basis as an engineer with an airplane company, his work for the petitioner was done at nights, on weekends, and on holidays. Anchor Jensen, of the local boat-building firm, Jensen Motor Boat Company, was the builder. The petitioner, Jones, and Jensen watched the 1948 Gold Cup races in Detroit in August 1948, and after their experience with the first Slo-Mo-Shun and Slo-Mo-Shun II and III they recognized the tremendous room for improvement in the designing of racing boats. At that time they also recognized the possibility of profit to be made in the designing, construction, and sale of racing boats. They considered the possibility that the Navy might become interested in the basic design of these fast boats and might become an important customer. Jones proceeded to design Slo-Mo-Shun IV which would be revolutionary in the field of unlimited hydroplane boats. He used the identical design which he had used for years in building and racing limited class boats. By August 1949, Jones and the petitioner concluded that Slo-Mo-Shun IV, which was then in the process of construction, would prove to be far superior to boats currently being used.

The petitioner had consulted his attorney, his accountant, and his financial adviser, an official of the Seattle-First National Bank, who all agreed on the profit possibility in the designing, building, and sale of boats. The banker advised against the petitioner's undertaking any such business enterprise in an individual capacity. In discussions with the attorney the petitioner suggested that inasmuch as the articles of incorporation of American Properties, Inc., already contained provisions which would authorize the construction and sale of boats and marine supplies or engines, such corporation might undertake the venture without the necessity of creating a new corporation.

The minutes of a meeting of the directors of the corporation held on August 31, 1949, contain the following:

Preliminary discussions had been had with reference to this corporation entering the field of boat building, ownership and management. Counsel reported that the Articles of Incorporation were sufficiently broad to warrant entry upon such a program.

Mr. Sayres in connection with the Country wide interest in power boat racing suggested that "Slo-Mo-Shun III" was in his opinion far superior to the major racing boats; that an improvement in design had been perfected and in his opinion "Slo-Mo-Shun III" was by no means the last word in the field. In other words, there would be continuous improvement and if sufficient time was devoted to experimental and engineering work other boats would become obsolete and the Seattle boat would be the pattern all over the Country.

He suggested that he believed if the Company would enter the field, do the necessary experimental and engineering work that not only was there money to be made in the manufacture and sale of racing crafts, but in the commercial field as well. That he believed the Government would itself be interested in the fastest type of boat that could be manufactured.

It was recognized that there would be substantial experimental cost to lay the groundwork for future development.

He further stated that he was willing to transfer title of Slo-Mo-Shun III to the corporation if the corporation would continue in an endeavor to work out improvements in design and engineering. He particularly suggested that a new improved Slo-Mo-Shun should be designed and built for actual racing use.

Mr. Sayres also advised that he had substantial offers for Slo-Mo-Shun III and had no doubt of the salability of Slo-Mo-Shun the IVth and boats of that design and class.

It was agreed that it was to the best interest of the corporation to enter this new field and proceed with the construction of a new boat upon the improved design of Slo-Mo-Shun III, all with the end in view of when the time was propitious getting into commercial operation.

Mr. Sayres was authorized to proceed accordingly.

At this time Slo-Mo-Shun IV was in the process of being built. It was launched in October 1949.

At some time before October 31, 1949, the corporation paid to the petitioner an amount of $14,690.30, which was the amount that had been expended by the petitioner in the construction of Slo-Mo-Shun III and of partial construction of Slo-Mo-Shun IV.

In 1949 there were no registration or licensing requirements with regard to boats of this character. The petitioner did not enter into any formal document transferring title of either Slo-Mo-Shun III or Slo-Mo-Shun IV to the corporation. There was no patent on the design of these boats.

The petitioner filled out forms with the county assessor of King County, Washington, for personal property tax purposes, as of January 1, 1950 and 1951, indicating that he was the owner of Slo-Mo-Shun IV. The petitioner left blank the part of such forms calling for information as to whether he had transferred title. He

belonged to the Seattle Yacht Club and has always been registered with the American Power Boat Association as the owner of Slo-Mo-Shun IV and V. The rules of that association provided, among other things, that each boat entered for a sanctioned race must be the bona fide property of the person in whose name she is entered, who must be a racing member of the association and a member of a club belonging to the association; that corporations or business concerns may not enter sanctioned races (although they may be members of the association) and may only enter a boat as the bona fide property of a club member who is also a racing member of the association, either by ownership or by charter.

On June 26, 1950, Slo-Mo-Shun IV, driven by the petitioner on Lake Washington, established a new world straightaway speed record of 160 m. p. h., breaking the 11-year-old record of 141 m. p. h. Recognizing the capabilities of this boat and the possibility of still further improvements of design in a model to be built, the petitioner sought a contractual arrangement which would include Ted Jones, the designer, and Anchor Jensen, the builder. However, because of disagreement as to technical engineering principles Jones refused to sign an agreement which would include Jensen as a party. On July 17, 1950, an agreement was executed "by and between AMERICAN PROPERTIES, INC., (and/or S. S. SAYRES) Party of the First Part, and TED O. JONES, Party of the Second Part," which provided that whereas the first party had financed construction of Slo-Mo-Shun III and Slo-Mo-Shun IV and whereas second party designed both of those boats and assisted in development, construction, and testing, the parties agreed as follows: The second party agreed to work exclusively for the first party in the design and development of "GOLD CUP" and "UNLIMITED" classes of racing boats during the existence of the contract and a period of 1 year thereafter; second party agreed not to disclose to others any basic or essential features of design, construction, or development; first party agreed that when constructing racing boats, only second party would be employed to design such boats and to supervise construction, and that upon all boats sold by first party, in whom title should always rest, second party would receive a fee of $5,000 or 10 per cent of sale price, whichever was greater, this being in addition to time and material charges such as had been paid in the past; first party agreed that if Slo-Mo-Shun IV should be sold for an amount greater than cost, first party would pay second party 10 per cent of actual net profit after taxes, or a flat sum of $5,000 whichever was greater, in which case second party would, in consideration thereof, design a new unlimited class racing boat for first party at no additional fee; both parties agreed that in event of any sale of plans and designs of Gold Cup and unlimited boats, first party would pay second party a fee of $2,500 together with traveling ex-

penses and a fee of $25 per day actually spent in supervising construction. It was provided that the agreement should continue until terminated by written notice of either party, giving 180 days' notice. It was signed by S. S. Sayres as president of American Properties, Inc., and in his individual capacity, and by Jones.

On July 22, 1950, Slo-Mo-Shun IV, driven by Ted Jones, won the Gold Cup race. Following that, Jones was approached by others seeking boats of the design of Slo-Mo-Shun IV. Horace Dodge sought to have two boats built, offering $50,000 per boat. Jones sought approval of the petitioner which was refused.

Slo-Mo-Shun IV, driven by Lou Fageol, won the Harmsworth Trophy on August 2, 1950.

In August 1950, the Seattle-First National Bank loaned American Properties, Inc., $26,000 to be used in operations in connection with the boats. No collateral was given for the loan.

In February 1951 construction of Slo-Mo-Shun V was commenced for the purpose of entering the 1951 Gold Cup races. The petitioner prevailed upon Jones and Jensen to work together in the construction of the boat. The boat was constructed at the premises of the Jensen Motor Boat Company under the supervision of Jones and with the aid of some of Jensen's boat builders. The boat was completed by the end of July 1951. Jones received $5,000 for designing Slo-Mo-Shun V in addition to compensation received on an hourly basis for its construction.

Lou Fageol, a wealthy sportsman who was one of the top two or three drivers in the country, drove Slo-Mo-Shun V and won the Gold Cup in 1951.

In 1952 Slo-Mo-Shun IV, driven by Stanley Dollar, a wealthy man of the Stanley Dollar Steamship Lines, won the Gold Cup race. Joe Taggart, who has had as much racing experience as Fageol, also drove the Slo-Mo-Shun boats in competition. In 1953 and 1954 either Slo-Mo-Shun IV or Slo-Mo-Shun V won the Gold Cup races. The Slo-Mo-Shun boats have also won the Martini-Rossi Trophy for the fastest heat in a Gold Cup race and the Aaron DeRoy Plaque for the fastest over-all race average. The petitioner's name appears on the Gold Cup as the winner and the various trophies which were won by Slo-Mo-Shun boats were kept at the Seattle Yacht Club. There were no cash prizes in racing these boats.

The petitioner did not himself personally drive any of the boats in closed course competitive races, such as the Gold Cup or the Harmsworth races. He did drive in speed competition, as in 1950 when he broke the world's straightaway speed record.

About November 1, 1951, Ted Jones left Seattle and went east to work as a boat designer for another concern. He thus ceased to operate under the agreement of 1950. No formal notice of termination

of the contract was ever given by either party. Because he felt restrained by the contract of 1950, Jones did not, for a number of years, build any boats for others of the design of the Slo-Mo-Shun boats, although he had many opportunities to do so. However, commencing in January 1954, he did design a number of boats for various individuals throughout the country, employing the design of the Slo-Mo-Shun boats. At the time of the hearing in this case in 1956, there were about 20 boats eligible for competition in the unlimited class, of which all but 4 were of the basic Slo-Mo-Shun design.

The members of the crew of these boats included highly skilled technicians who worked on the various Slo-Mo-Shun boats in their spare time since they were full-time employees of other organizations. None of them was employed by either American Properties, Inc., or American Automobile Company. Jones was compensated for designing the boats and Jensen was paid for his work in building them.

The principal construction work took place at the Jensen Motor Boat Company, but the engine work was done at the premises of American Properties, Inc., then under lease to American Automobile Company, where there was a machine shop for assembling engines. The small handtools which were used were the properties of American Properties, Inc. Only occasionally was equipment of American Automobile Company used. An electric hoist which was used was not the property of American Automobile Company. Engines and parts were stored at these premises.

All costs of completing and operating Slo-Mo-Shun IV and the costs of building and operating Slo-Mo-Shun V were borne by the corporation, including the expenses incurred in racing them, such as traveling expenses of the crew to Detroit in 1950.

The building owned by the American Properties, Inc., was located about 1½ to 2 miles from the nearest navigable body of water. Slo-Mo-Shun III was moored at a dock at the petitioner's residence on Lake Washington. Later the petitioner constructed another residence on Lake Washington to which he moved in December 1950, and the Slo-Mo-Shun boats were then housed in the boathouse at such residence. At times the boats were housed at the Jensen Motor Boat Company, which is on Lake Washington about 5 miles from the petitioner's new residence.

Greater Seattle, Inc., a nonprofit, publicly subscribed corporation which promoted the annual Seafair and other sporting events, sponsored campaigns to raise money for the operation of the Slo-Mo-Shun boats because of the advantage to Seattle of bringing the Gold Cup race to Seattle. In 1950 the amount contributed by Greater Seattle, Inc., for this purpose was $6,912.15. This contribution, whether paid to the petitioner in the first instance, or to the corporation, was ultimately received by the corporation to defray part of the expense of

operating Slo-Mo-Shun IV. In subsequent years other contributions were also received from Greater Seattle, Inc., through campaigns for public subscription. In sponsoring campaigns for raising money for this purpose, Greater Seattle, Inc., held the petitioner out as the owner of the boats. Newspaper articles also consistently referred to the petitioner as the owner of the boats. The official programs of the Gold Cup races listed him as the owner.

The petitioner has never sold any of the Slo-Mo-Shun boats or any designs therefor. After Slo-Mo-Shun IV had been constructed, some civilian representatives of the Navy Department examined it and observed it in action. There was no subsequent indication that the Navy would be interested.

In its income tax returns for the calendar years 1949 and 1950 the corporation showed its principal business activity as "Real Estate" and "Lessor of Building," respectively. It reported net income of $8,423.26 in 1949 and a net loss of $1,561.41 in 1950. Its returns show that it had surplus at December 31, 1949, of $74,659.49 (of which $37,497.43 was earned surplus) and at December 31, 1950, surplus of $71,260.73 (of which $34,098.67 was earned surplus).

In the calendar year 1949 the corporation expended $2,155.56 in operation and maintenance of the boats, which it deducted on its corporate tax return as business expenses. The respondent disallowed this amount to the corporation. In addition, the corporation expended $561.39 as additional boat expense which it did not deduct on the corporate return.

For the calendar year 1950 the corporation expended $19,300.58 for operation and maintenance of the boats and deducted on its return the amount of $12,388.43 (after offsetting the contribution from Greater Seattle, Inc., in the amount of $6,912.15). In the return there was included $1,000 as income from endorsement of an oil product. In this situation the respondent considered that there had been claimed a net deduction of $11,388.43, which he disallowed.

The corporation capitalized on its books and its returns for 1949 and 1950 the amounts expended for construction of the boats and related equipment (including the amount of $14,690.30 which was paid by the corporation to the petitioner as hereinabove stated). In the 1949 return the balance sheet at the end of the year includes in depreciable capital assets the amount of $18,609.16 for boats and equipment, but no depreciation was claimed. For 1950 the amount of capitalization of boats and equipment at year end was $22,323.37 upon which depreciation was taken in the amount of $5,830.84, which was disallowed by the respondent. The respondent included as additional income of the individual petitioners all amounts expended by the corporation in connection with the boats. Inasmuch as the individuals were on a fiscal year ending October 31, whereas the

corporation was on a calendar year basis, the respondent determined the amounts which had been expended during the taxable years of the individuals. For the fiscal year ended October 31, 1949, the respondent attributed additional income to the individuals in the amount of $16,401.51, consisting of $1,149.82 of disallowed corporate expenses to October 31, 1949, $561.39 representing additional boat expense paid by the corporation and not deducted on the corporate return, and $14,690.30 representing the amount paid to the petitioner by the corporation and capitalized on the corporate return. For the fiscal year ended October 31, 1950, the respondent attributed additional income to the individuals in the amount of $16,595.31, consisting of $1,005.74 expended by the corporation as boat expenses from November 1 to December 31, 1949, $7,956.50 of net expenses from January 1 to October 31, 1950, and $7,633.07 expended during the year ended October 31, 1950, and capitalized by the corporation.

On June 29, 1951, the corporation filed a claim for refund of taxes for the year 1949, based upon the carryback of a claimed net operating loss for 1950. On August 19, 1952, the corporation filed another claim for refund for the year 1949, based upon a claim that it understated its net operating expenses by the amount of $561.39 referred to hereinabove.

The activities of the petitioner and the corporation during the years in question with respect to the boats were not conducted with the intention of making a profit. Such activities did not constitute the conduct of a trade or business by either the petitioner or the corporation.

### Salary Issues.

*Jen-Cel-Lite Corporation.* The petitioner was employed in some undisclosed capacity by the Jen-Cel-Lite Corporation. At a meeting of the board of directors of that corporation on November 19, 1949, his salary was fixed at $4,000 for the period July 1 to November 30, 1949, and at $800 per month thereafter. The Jen-Cel-Lite Corporation operated on the basis of a fiscal year ending November 30. In the joint return of the individual petitioners for their taxable year ending October 31, 1950, there was included salary from Jen-Cel-Lite Corporation in the amount of $9,600, this being at the rate of $800 per month for 12 months. The amount which properly should have been included as taxable income by the individuals in the return for the year ending October 31, 1950, is $12,800. The respondent increased the reported income to $12,800 and determined an addition to tax for that year under authority of section 293 (a) on account of the omission of the $3,200.

The return in question was prepared by a public accounting firm. It was Sayres's practice to furnish such firm with information as to

deductions and interest and donations, and income items such as dividends. The accounting firm also audited the books and prepared the returns of American Automobile Company and Jen-Cel-Lite Corporation. The error of the accounting firm in failing to include the proper amount of salary from Jen-Cel-Lite Corporation was due to confusion resulting from the different fiscal years of the corporation and of the individual petitioners. The petitioner was unaware of this omission until it was brought to his attention by the accounting firm after the revenue agent had discovered the omission and called it to the attention of the accounting firm. The part of the deficiency for the taxable year of the individual petitioners ended October 31, 1950, which is attributable to the omission from the joint return of the $3,200 of salary income is due to negligence within the meaning of section 293 (a) of the Internal Revenue Code of 1939.

*American Automobile Company.* The American Automobile Company operated on the basis of a fiscal year ending April 30. At a meeting of the board of directors of that corporation held on April 23, 1948, the petitioner's salary as president was fixed at $42,000 "for the year ending April 30th, 1948." The petitioner's annual salary had previously been $30,000, which had been credited at the rate of $2,500 monthly. An entry was made on the books of the corporation on April 30, 1948, crediting the petitioner with an amount of $12,000 to reflect the increase in salary for that fiscal year of the corporation. That entry was never reversed and the corporation included this amount in its deduction for salaries. The corporation withheld tax on a total of $48,000 and the individual petitioners took credit on their returns for their fiscal year ended October 31, 1948, of the full amount withheld. Such salary of $42,000 was continued through the succeeding fiscal year of the corporation.

The proper amount of Sayres's taxable salary from American Automobile Company for his fiscal year ended October 31, 1948, was $48,000, consisting of $15,000 originally credited for the first 6 months of his fiscal year, $21,000 credited to him at the higher rate for the last 6 months of his fiscal year, and the amount of $12,000 credited to him on the books of the corporation on April 30, 1948, representing a retroactive increase in salary for the *corporation's* fiscal year ended April 30, 1948.

In their separate income tax returns for their fiscal year ending October 31, 1948, each individual petitioner reported the salary from American Automobile Company at $42,000 and each reported $21,000 as community income. Each of these returns was prepared by the public accounting firm which customarily prepared the returns of the individuals. The accounting firm committed error in including the incorrect amount in each return. Its error was due to failure to recognize the effect of the different taxable years of the

corporation and the individual petitioners. The individual petitioners were not aware of any error in their returns in this respect until the public accountant advised them at the time of the revenue agent's examination in November 1951.

In determining the deficiency the respondent increased the reported community income of each individual petitioner by the amount of $3,000 and determined an addition to tax pursuant to section 293 (a). The part of the deficiencies for the taxable year of the individual petitioners ended October 31, 1948, which is attributable to the omission from their returns of $6,000 of salary income is due to negligence within the meaning of section 293 (a) of the Internal Revenue Code of 1939.

OPINION.

The answers to the questions here presented for decision depend upon whether the activities involving the designing, construction, operation, and racing of the speed boats constituted, in the years in controversy, a business of the petitioner American Properties, Inc., or whether they constituted the personal hobby of the petitioner Sayres, sole owner of the corporation. There can be no question that prior to the years in controversy such activities were purely the hobby of the individual. The record is replete with evidence to this effect. He had an insatiable desire for speed, and in his testimony he conceded that racing had been his hobby. Prior to the years in question the business of the corporation consisted of owning and renting a building to the petitioner's other corporation, American Automobile Company, which operated an automobile dealership or agency.

The parties devote much of their argument to the question whether title to the boats was in the petitioner or in the corporation. The evidence shows that at a meeting of the directors of the corporation held on August 31, 1949, the petitioner stated that he was willing to transfer title to Slo-Mo-Shun III to the corporation if the corporation would continue to work out improvements in design and engineering. The minutes recite that it was agreed that it was to the best interest of the corporation to enter this new field and that Sayres was authorized to proceed accordingly. The corporation paid the petitioner $14,960.30 purportedly as purchase price, which was the amount that had been expended by the petitioner in the construction of Slo-Mo-Shun III and of partial construction of Slo-Mo-Shun IV. Thereafter it continued to pay all costs of construction and operation of the boats. These facts would tend to indicate that it was the intention to transfer title to Slo-Mo-Shun III and the partially constructed Slo-Mo-Shun IV to the corporation. On the other hand, there is other evidence which tends to indicate that title did

not pass. There was no formal document transferring title and the petitioner continued to hold himself out as the owner before the public. He represented himself as the owner of Slo-Mo-Shun IV during the years 1950 and 1951 in his statements made for purposes of county property taxes. Furthermore, he apparently continued to deal with the boats in the same manner as he had theretofore, including mooring or housing them at his private residence. The boats were registered in his name as owner on the records of the American Power Boat Association, and in the official programs of races his name appeared as the owner.

The question of whether title passed is not in itself decisive of the issues presented, but is merely one of the factors involved in the more important question of whether the corporation did enter into a true business venture of exploiting these racing boats for profit. The determination of whether the activities of a taxpayer constitute the carrying on of a trade or business requires an examination of the facts in each case. *Higgins* v. *Commissioner*, 312 U. S. 212. It has been held that whether an enterprise is conducted as a business for profit is a matter of intention and good faith, and all the facts in a particular case are to be considered. *Commissioner* v. *Field*, (C. A. 2) 67 F. 2d 876, affirming 26 B. T. A. 116. See also *Doggett* v. *Burnet*, (C. A., D. C.) 65 F. 2d 191; *Thacher* v. *Lowe*, 288 F. 994; *Edwin S. George*, 22 B. T. A. 189.

Thus, the issues in the final analysis turn upon the question of whether during the years in question the petitioner and the corporation had the requisite intent or motive of making a profit. Intention is a question of fact to be determined not only from the direct testimony as to intent, but from a consideration of all the evidence, including the conduct of the parties. The statement of an interested party of his intention and purpose is not necessarily conclusive. *Helvering* v. *National Grocery Co.*, 304 U. S. 282, affirming 35 B. T. A. 163. In *R. L. Blaffer & Co.*, 37 B. T. A. 851, affd. (C. A. 5) 103 F. 2d 487, certiorari denied 308 U. S. 576, we stated that one's categorical statement may be of less weight than the facts and circumstances which affect it and that "[t]o be skeptical of the weight to be accorded an interested witness' statement in view of other evidence is not the same as wholly to reject the statement as if it were dishonest."

The petitioner testified that while watching the Gold Cup races at Detroit in 1948, he, Jensen, and Jones conceived the idea that there might be a profit in the designing, construction, and sale of racing boats. Thereafter he discussed the possibilities with his banker and financial adviser, his attorney, and his accountant and they all agreed that there were profit possibilities, and the corporate form was recommended. There was some testimony as to profit possibilities in sale

of rights to the design of the boats, but the evidence shows that the boat designs were not patented and the petitioner expressed his belief that they were not patentable. He testified that he constructed Slo-Mo-Shun IV and Slo-Mo-Shun V primarily because there was a good business opportunity. His attorney testified that the petitioner entered into the corporate venture with the idea of its being a profit enterprise. The petitioner testified that the further they went in the development of these boats the more convinced he became that there could be a commercial field resulting from revolutionizing hydroplane racing boats. He stated that the most startling way to do that would be to break the straightaway record that Sir Malcolm Campbell had held for 11 years.

While we do not doubt that the petitioner and others held the belief that there was a profit possibility, we do not believe, in the light of other testimony of the petitioner and others and the conduct of the petitioner, that there was an intention or motive of immediately embarking upon a business venture. Rather, we believe that the parties had in mind merely the possibility of entering into a commercial venture at some future time when it might be deemed expedient to do so. The evidence shows that this never did eventuate.

The minutes of the meeting of the directors of the corporation held on August 31, 1949, state that the corporation was to proceed "with the end in view of when the time was propitious getting into commercial operation." This left the intended time of actually entering into business in an uncertain state. Actually no boats were ever produced except the particular racing boats Slo-Mo-Shun IV and Slo-Mo-Shun V, which were not intended for sale but rather to be entered in the Gold Cup races with a view to winning those races, and there is no showing of any attempts to sell any boats, to build any for sale, to build any on a fee basis, or to sell any plans or designs for boats. It is contended that testing and proving the boats was a necessary preliminary step in the business of building and sale of boats. However, despite the fact that Slo-Mo-Shun IV did establish a new world speed record in June 1950 and did win the Gold Cup in July of that year, the corporation, which had no boat-building facilities and had no continuing contract with Jensen for building, did not proceed to provide boat-building facilities or take the ordinary steps which might be expected of a business organization looking toward making a profit, such as advertising or making other selling attempts. On the contrary, when Slo-Mo-Shun IV won the Gold Cup race, Jones, the designer and driver, was approached by others seeking boats of this design and one person offered large prices for two boats, but when Jones relayed these offers to the petitioner the latter told him "[t]hat we wouldn't be building for anyone." Jones gathered from the conversation with the petitioner that the rea-

son was that the petitioner did not want any competition from other boats of the Slo-Mo-Shun design. The petitioner testified that he did not attempt to talk to this prospective purchaser, but that he "wanted somebody to talk directly to me about it." He said that he was not interested in making a profit on Slo-Mo-Shun IV because if he had sold it in 1950 it would have ended any hope of "going on with the development, continuing development and getting into the boat business." He admitted that he had stated for publication in newspapers that he would not sell unless he had another boat ready for competition for the Gold Cup, this being necessary because if he failed to defend the cup it would move out of Seattle and he would be unpopular in the area. We note that according to Jones's testimony the prospective purchaser did not desire to buy Slo-Mo-Shun IV, but wanted to have two similar boats built, at what Jones stated was a good price. Jones further testified in effect that the reason no other boats were built after Slo-Mo-Shun V was because that particular boat sufficed for the 1951 racing season and that the petitioner did not suggest the building of any further boats.

It would seem that a "propitious" time for actively going into production and sale would have been in 1950 after winning the Gold Cup race. The petitioner's refusal to proceed at that time is certainly not consistent with the claim that he was interested in profit. On the contrary, it indicates a continuation of the hobby for his personal pleasure and satisfaction. In August 1951, the corporation borrowed $26,000 to be used in connection with the boats, but this was after his refusal of offers to buy boats and cannot be considered as indicating a profit motive.

About November 1, 1951, Jones left Seattle and went to work for a boat designer in the east. In January 1954, he commenced building boats of the Slo-Mo-Shun design for various individuals. The petitioner testified that Jones's departure was the reason that the originally conceived idea of producing racing boats did not ultimately materialize on a commercial basis. No reason is given for his departure and we think it is indicative that he was convinced that there would be no commercialization of the boats.

It is also noted that the operation of the Slo-Mo-Shun boats and expenses of their competition were financed in substantial amount by public contributions through the civic organization, Greater Seattle, Inc. We seriously doubt that a man of the community standing of the petitioner would have permitted these public subscriptions on the public understanding that the operation of the Slo-Mo-Shun boats was a nonprofit hobby, if such had not been the case. At various times the petitioner in interviews with the press referred to himself as the owner of the boats and referred to his activities as his hobby. In letters which he addressed in 1953 to a

newspaper editorial writer in response to an editorial concerning him and his boating activities, the petitioner stated that he had personally spent more than $100,000 in building and developing the Slo-Mo-Shuns, and that no tax adviser had yet been able to tell him how to deduct these very substantial sums for either business or personal income tax purposes.

Upon a full consideration of all the evidence, we are constrained to the view that during the years in question the activities of the petitioner and the corporation with respect to the boats were not conducted with the intention of making a profit and that such activities did not constitute the conduct of a trade or business by either the petitioner or the corporation, and we have so found as a fact. There have been a number of cases, some of which are referred to hereinabove, involving activities which partook to some extent of the nature of hobbies (such as farming, horseracing, horsebreeding, dog raising, etc.) which were held to constitute businesses justifying the deduction of losses for tax purposes. However, such cases are distinguishable in that in each the taxpayer had definitely embarked upon business activities with intent to make a profit. In none of them did the taxpayer merely have in mind the thought of possibly engaging in business activity for profit at some future time, as is true in the instant case.

We hold that the corporation is not entitled to deduct the cost of maintenance and operation of the boats under section 23 (a) (1) of the Internal Revenue Code of 1939, as ordinary and necessary expenses paid or incurred in carrying on a trade or business and that it is not entitled to deductions for depreciation on the boats, irrespective of whether title to the boats was in the corporation, since section 23 (1) requires, as a condition to such depreciation deductions, that the property be used in a trade or business.

The respondent has held that the amounts paid by the corporation for construction, operation, and maintenance of the boats, including the amount paid to the petitioner in reimbursement of his previously incurred expenditures, are taxable income to the individual petitioners. The respondent in so holding did not limit himself to the theory of constructive receipt of dividends and on brief states that these expenditures constitute a diversion of corporate funds by the dominant stockholder for his personal benefit and as such constitute additional income to him, citing *Davis* v. *United States*, (C. A. 6) 226 F. 2d 331, certiorari denied 350 U. S. 965. We have hereinabove held that the expenditures were not incident to a business carried on by the corporation. We are satisfied that, irrespective of whether title to the boats was in the petitioner, such expenditures were made for his personal pleasure or to gratify his personal or civic pride in the accomplishments of these racing boats. The respondent's deter-

mination that these amounts are taxable to the individuals is prima facie correct and the petitioners have not shown error in his determination. It is well settled that payments made by a corporation on behalf of its stockholder may constitute taxable dividends to the stockholder. *Louis Greenspon*, 23 T. C. 138, affirmed, on this issue (C. A. 8) 229 F. 2d 947; *Oreste Casale*, 26 T. C. 1020, on appeal (C. A. 2); *Paramount-Richards Theatres, Inc.*, v. *Commissioner* (C. A. 5) 153 F. 2d 602. The petitioners have not shown that there were not earnings and profits available in the corporation out of which the amounts in question could be paid and be properly treated as taxable dividends. The corporate returns indicate that there were sufficient earnings and profits available. The respondent's determination that the amounts in question are taxable to the individual petitioners is approved.

The petitioners contend, alternatively, that if the corporation was not engaged in the business then they were, and that the amounts if taxable to them, would also be deductible by them. As stated above, we think that neither the corporation nor the individual petitioners were engaged in the business. Rather, the expenditures were in furtherance of the private hobby of the petitioner Sayres and as such may not be deducted in view of the provisions of section 24 (a) (1) of the Internal Revenue Code of 1939.

The individual petitioners concede that the respondent properly increased their reported taxable income from salary of Jen-Cel-Lite Corporation by the amount of $3,200 for their fiscal year ending October 31, 1950. However, they dispute the determination of an addition to tax under section 293 (a) of the Internal Revenue Code of 1939.[2]

They contest the respondent's determination that for their fiscal year ending October 31, 1948, they had additional salary income from American Automobile Company in the amount of $6,000, and also contest the determination of an addition to tax for that fiscal year under section 293 (a).

The petitioner Sayres testified and contends that it was not intended that his increase in salary voted by American Automobile Company on April 23, 1948, was to be retroactive to the beginning of the corporation's fiscal year which began on May 1, 1947, but that it was intended that it should be prospective commencing May 1, 1948. If this were true then the increase of $1,000 per month would

---

[2] SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

(a) NEGLIGENCE.—If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.

result in the receipt of taxable salary by him of only $36,000 for his fiscal year ending October 31, 1948. However, for that year there was reported by the individual petitioners in their returns the amount of $42,000 as salary. We have carefully examined the resolution passed by the directors of the corporation and we do not find it ambiguous to any extent. It clearly increased the petitioner's salary to $42,000 "for the year ending April 30th, 1948." Furthermore, the petitioner was credited on the books of the corporation with an amount of $12,000 to reflect the increase for that fiscal year of the corporation. It is true that some portion of the $12,000 related to a period prior to the commencement of the petitioner's fiscal year ended October 31, 1948, but nevertheless such full sum of $12,000 first became available to him in his fiscal year ended October 31, 1948, and must be treated as taxable income to him in that year. Even though there may have been some misunderstanding as to when the increase should commence, the fact is that the petitioner was actually credited with the $12,000, no correction was ever made, and the corporation deducted such full amount. Upon the record we have concluded that $48,000 was the proper amount of taxable salary of the petitioner from American Automobile Company for his fiscal year ended October 31, 1948. We approve the respondent's determination in this respect.

The individuals contend that they should not be held liable for an addition to tax under section 293 (a) because of the fact that they were not aware of any omissions from their returns until 1951 when the revenue agent discovered the errors, and that they relied upon an accounting firm to obtain the proper information as to salary from the two corporations. They also state that the errors of the accounting firm in failing to determine the proper amount of salary income were not unreasonable but are understandable because of the confusion arising by virtue of the difference between the fiscal years of the corporations and of the petitioners. The point is also made that the individuals, and also the accountants, would not be put on notice of omissions by an examination of the W-2 forms furnished by the corporations because of the fact that on such forms the data was submitted on the basis of a different time period.

There is no question here as to the good faith of the petitioners. Wholly aside from the question of good faith, a taxpayer may be guilty of negligence requiring the imposition of an addition to tax on account of negligence. *Evans v. Commissioner*, (C. A. 8) 235 F. 2d 586, affirming T. C. Memo. 1955-126, certiorari denied 352 U. S. 909. It is well established that the duty of filing accurate returns cannot be avoided by placing responsibility upon an agent. *Vern W. Bailey*, 21 T. C. 678; *Harold B. Franklin*, 34 B. T. A. 927; *Irving Fisher*, 30 B. T. A. 433. And we have held that taxpayers must

bear the responsibility for the failure of their agents, *Hyman B. Stone*, 22 T. C. 893.

Here it is admitted that $3,200 in salary from Jen-Cel-Lite Corporation was erroneously omitted, and we have held that $6,000 of salary from American Automobile Company was erroneously omitted. The petitioners now contend that the increase in salary voted by American Automobile Company was not intended to be retroactive, but the facts are that Sayres was credited with the full amount of $48,000 on the books of the corporation, that the corporation deducted such amount and withheld tax on that amount, and that the individual petitioners took credit for such withholding. Furthermore, in their separate returns they did return a total of $42,000 which includes $6,000 in excess of what they should have returned had the increase not been retroactive.

The fact that the individual petitioners and the corporations operated upon the basis of different taxable years is not a valid excuse for the failure to exercise due diligence. This situation is not unusual. Accountants preparing returns encounter it frequently. Here the accounting firm certainly knew about the different fiscal years since it audited the books of the corporations and prepared the returns of both the corporations and the individuals. There should have been such an investigation made either by the petitioners or by the accounting firm as would have disclosed the correct amount of salary received by the petitioner or credited to him in his fiscal years which are in question. This was not done. One of the members of the accounting firm testified that the particular accountant, now deceased, who was handling this matter failed to consult the audit papers and that he did not reconcile the deductions taken by the corporations for salaries with the personal returns of the individuals. He further testified that the accountant did not go to the files of the American Automobile Company to see what amounts had been credited to Sayres and therefore overlooked the credit of $12,000 on the books of that company. He stated that unquestionably a mistake was made and that it came to light only when the revenue agent made his examination. He also stated that Sayres was of the opinion that there was negligence in the accounting office, that these items should have been discovered, and that the accountant did not do what he should have done.

Under these circumstances we have concluded and have found as a fact that the portions of the deficiencies due to omissions of salary income were due to negligence within the meaning of section 293 (a).

The cases of *R. E. Nelson*, 19 T. C. 575, and *Rhett W. Woody*, 19 T. C. 350, cited by the petitioners, are not analogous. In those cases the deficiencies were not due to negligence. They were due to

the erroneous tax treatment of certain items, but the taxpayers had acted in good faith in reliance on the advice of accountants who were conversant with tax matters and who were fully apprised of the facts.

The respondent's determinations of additions to the tax under section 293 (a) are approved.

*Decisions will be entered under Rule 50.*