Norma Mathews Lauer v. Commissioner.
Lauer v. Commissioner
Docket No. 81662.
United States Tax Court
T.C. Memo 1961-208; 1961 Tax Ct. Memo LEXIS 141; 20 T.C.M. (CCH) 1038; T.C.M. (RIA) 61208; July 14, 1961
*141 Held, that petitioner was engaged during each of the taxable years in carrying on a business of breeding, buying, selling, and exhibiting horses, with a view to profit; and accordingly, that the losses which she sustained therefrom are deductible from her gross income for said years. William F. Roberts, Esq., for the petitioner. Timothy T. Tuerck, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioner's income taxes for the calendar years 1955, 1956, and 1957, in the respective amounts of $2,476.84, $3,058.51, and $1,526.76. The sole issue presented for decision is, whether petitioner was engaged during the taxable years in a trade or business of breeding, raising, buying, selling and exhibiting horses. If she was so engaged, then she correctly deducted a loss which she suffered in each of the taxable years, measured by the excess of her expenses in connection with such activities over the income which she derived therefrom. The respondent disallowed deductions for such losses which petitioner claimed on her returns. Findings of Fact Petitioner is a married woman, *142 residing in Sacramento, California. She filed a separate individual Federal income tax return for each of the taxable calendar years 1955, 1956, and 1957, with the district director of internal revenue at San Francisco, California. Since early in her childhood, petitioner has owned and been fond of horses. Petitioner was given her first horse when she was 9 years old, and ever since that time (with the exception of a "few years" when she resided in Montana), she has always owned horses. When she was in high school, she followed a practice of acquiring a horse, training it, exhibiting it, and then selling it; and thereafter acquiring another horse and following the same cycle. During the period up to 1946, petitioner kept her horses in a public stable in Sacramento or on a ranch in which her mother had an interest. Beginning in 1947 petitioner began to acquire "quarter horses" [1] with a view to exhibiting them at horse shows, breeding the mares, and then selling some of the colts and retaining others. Petitioner at about the same time began keeping her horses on premises at 640 Howe Avenue in Sacramento, which were owned by her mother and which also served as the residence of petitioner *143 and her husband. The Howe Avenue premises consisted of a residence house, barn, paddocks and fenced-in pasture land. Petitioner inherited the Howe Avenue property in 1955, upon the death of her mother, During the period from 1947 through 1954, petitioner raised and sold 3 colts which were foaled by her mares. Throughout this same 1947-1954 period, petitioner also made purchases and sales of quarter horses. The following table shows the number of horses in petitioner's herd, the number of horses acquired, and the number disposed of by sale or exchange or by death, for each of the years 1947 through 1954: Number
of Horses
Number
in Herd
of
Number of
During
Horses
Horses Dis-
Year
Year
Acquired
posed Of
1947
3
3
0
1948
5
2
0
1949
5
0
2
1950
4
1
0
1951
6
2
3
1952
4
0
1
1953
5
2
2
1954
6
3
0
Beginning in 1952, petitioner began to purchase significant amounts of equipment for *144 her horse breeding, raising, and showing activities (hereinafter, for simplicity, called collectively "horse-breeding activities"). In 1952, she purchased two horse trailers and sundry items of equipment at a total cost of $1,365.07. In 1954, she purchased a station wagon and trailer at a total cost of $1,800 and additional saddles and other equipment costing $263.09. In 1955, she purchased a 3/4-ton pickup truck at a cost of $2,727. And in 1957, miscellaneous items of equipment costing $100.88 were purchased. During the taxable years involved, the number of horses in petitioner's herd, the number of horses acquired, the cost thereof, and the number of horses sold or traded were as follows: Number
of
Number
Cost
Number
horses
of
of
of
in
horses ac-
horses
horses
Year
herd
quired
acquired
disposed of
1955
10
4
$5,500 [1]
None
1956
14
4
2,500 [2]
4
1957
13
3
3,000 [3]
4
*145 Petitioner did not employ magazines or newspapers as media for advertising her horses for sale during the taxable years, or at any other time. Rather she chose for this purpose to exhibit her horses in shows throughout the State of California and also in the State of Oregon. Petitioner always followed the practice of informing spectators at these horse shows that she had horses for sale; and she was able to effect sales of horses by this means. Regarding the records kept by petitioner of her activities in connection with horses, she always retained all of her invoices and cancelled checks for her expenditures; and she also kept copies of bills of sale of horses sold, as well as a record of prizes which her horses won at the shows. She inquired of her accountant in 1953 if she should set up a regular set of books; and the accountant advised petitioner that this would not be necessary. Petitioner performed most of the work in connection with the carrying on of her horse-breeding activities during the taxable years. She devoted all of the time that her health and family circumstances permitted, to such activities during said years. In 1957, her husband withdrew from a motorcycle *146 sales business which he had been operating, in order to help petitioner with her horse-breeding activities. Also, her 1957 Federal income tax return shows the payment of $1,200 of wages in connection with said activities. (The recipient of such wages is not identified in the record.) Besides hauling her horses to shows and there exhibiting them, petitioner transported her mares to farms operated by owners of the stallions to which her mares were bred. Petitioner also attended to the feeding of the horses in her herd, and to their care in such matters as veterinary services and shoeing. The quarter horse became increasingly popular and sought after during the period from 1950 to 1960. Along with this increase in demand, there was an increase in the price which such animals brought when sold. Among the quarter horses most sought after were those descended from a quarter horse stallion, not owned by petitioner, named Driftwood. Beginning early in the 1950's, petitioner sought to perpetuate the Driftwood line in her herd. To this end, in 1954 petitioner purchased Buckwood, a mare descended from Driftwood; and also petitioner bred her other mares to stallions descended from Driftwood. *147 Horses descended from Driftwood were in especially high demand by persons who participated in rodeos. Petitioner is and was during the taxable years, a member of four associations of horsemen: American Horse Shows Association, Inc.; American Quarter Horse Association; Pacific Coast Quarter Horse Association; and Pacific Coast Hunter, Jumper and Stock Horse Association. In 1960, she made application for issuance to her of an amateur status membership card by the above-named American Horse Shows Association, Inc. In the application blank which she signed, the following statements appeared: I have not engaged in any of the following categories either as a method of support or as a method of increasing my personal income in any substantial degree: a. breeding, riding, driving, schooling, training or boarding horses, or * * *
c. buying, selling or dealing in horses; Petitioner was issued an amateur's card in response to her said application. From 1947 up to July 1960, petitioner exhibited her horses in shows as an amateur. Petitioner is a woman with independent means of support. During the taxable years involved, as well as prior and subsequent thereto, petitioner received *148 income from a trust established by her parents, and also from annuities, dividends, rent, and interest. Petitioner's horse-breeding activities did not, in any year from 1952 through 1959 yield a profit but rather they were operated at a loss. On petitioner's Federal income tax return for each of the taxable years, she reported the following income, expenses and losses from her activities in connection with horses: 1955
1956
1957
Income
$1,921.47
$ 2,867.79
$3,759.45
Expenses
8,175.41
11,353.24
9,798.57
Net Operat-
ing Loss
($6,253.94)
($ 8,485.45)
($6,039.12)
None of the expenses in the foregoing table were related to the upkeep and maintenance of the residence house occupied by petitioner and her family. All of the income items in the foregoing table represent prizes won by petitioner from exhibiting her horses at shows, with the exception of $550 in 1955 which was described as being from the "sale of horse." (The record does not reveal the identity of this horse.) In addition, petitioner reported capital gains from the sales of horses during the taxable years, as follows: Prior
Gross
depre-
sales
ciation
Year
price
taken
Basis
Gain
1956
$2,200
$ 400.00
$1,600
$1,000.00
1957
5,000
3,808.84
4,250
4,558.84
*149 On petitioner's return for each of the taxable years, the amounts shown above as net operating losses were deducted from her income from other sources. Respondent, in his statutory notice of deficiency, disallowed the losses so claimed by petitioner; and he gave the following explanation for his action: It is held that your activities in connection with the exhibition and breeding of horses do not constitute a bona fide business venture or a transaction entered into for profit. The loss claimed as a business loss * * * representing the excess of expenses claimed over receipts reported from the exhibition and sale of horses, has therefore been disallowed as a nondeductible personal loss. Ultimate Fact During each of the taxable years 1955, 1956 and 1957, petitioner intended to be, and was, engaged in the trade or business of breeding, raising, buying, selling, and exhibiting horses, with a view to profit. Opinion There is no question but that petitioner bought, sold, bred, raised and exhibited horses during each of the taxable years involved. There also is no dispute that she derived income from these activities; that she incurred and paid expenses in connection therewith; *150 and that the expenses of each year exceeded the income, thus giving rise to a loss for each year. Nor is there any dispute as to the amounts of the income, expenses and losses involved. The sole and narrow question presented for decision in the instant case is: Was petitioner engaged in a trade or business with a view to profit, insofar as the abovementioned horse activities are concerned (as she contends she was); or was she, in connection with said activities, merely pursuing a hobby for pleasure (as the respondent determined and here contends to be the case). Such question is one of fact, to be determined in the light of all the facts and circumstances of the particular case. The burden of proof is, of course, on the petitioner to establish that she engaged in the trade or business that she contends she was in. We are satisfied, after seeing the witnesses testify and listening to their testimony, and after considering all the facts and circumstances of the instant case, that petitioner has established by the preponderance of the evidence, that she was in the trade or business of breeding, raising, buying, selling, and exhibiting horses with a view to profit, during each of the *151 taxable years - and we have hereinabove so found as an ultimate fact. In conection with what is sufficient to cause an occupation to constitute a "trade or business," we said in Kerns Wright, 31 T.C. 1264, 1267, affd. (C.A. 6) 274 F. 2d 883: Business has been defined as including "that which occupies the time, attention, and labor of men for the purpose of livelihood or profit." Flint v. Stone Tracy Co., 220 U.S. 107, 171. But it is recognized that whether an occupation constitutes a trade or business must be decided on the facts in each case, Frederick A. Purdy, 12 T.C. 888, and the intent of the taxpayer has a material bearing on the issue, Morton v. Commissioner, 174 F. 2d 302, certiorari denied 338 U.S. 828, although it is not conclusive. While profits and losses are factors to be considered in determining whether a taxpayer's intention is to engage in a busines for a livelihood or profit, Thacher v. Lowe, 288 F. 994, the fact that the activity is conducted at a loss does not itself preclude its being considered a business. Doggett v. Burnet, 65 F. 2d 191. * * * "Intention, *152 " we said in American Properties, Inc., 28 T.C. 1100, 1111, affd. (C.A. 9) 262 F. 2d 150, "is a question of fact to be determined not only from the direct testimony as to intent, but from a consideration of all the evidence, including the conduct of the parties. The statement of an interested party of his intention and purpose is not necessarily conclusive." The respondent has recognized that the operation of horse breeding farms may constitute a trade or business. See G.C.M. 21103, 1939-1 C.B. 164, wherein it is stated, in part, as follows: Numerous cases have been decided by the Courts and by the Board of Tax Appeals involving the question of whether horse breeding and racing activities constitute a trade or business. In a few cases such activities have been held not to constitute a trade or business. * * * [Citations.] In other cases, which are much more numerous, the decision has been to the contrary. * * * [Citations.] An analysis of the above-cited cases discloses that the operation of horse breeding farms and racing stables may constitute a trade or business; that the question of whether or not such operations constitute a trade *153 or business depends upon whether the activities are for the purpose or with the intention of making a profit, provided the expectation of profit is reasonable; that the question of intention is a question to be determined in each case upon the particular facts presented; that the taxpayer's intention or purpose of making a profit, as disclosed by his own testimony and by other evidence, is sufficient to establish the business character of the enterprise, provided the expectation of profit is reasonable; and that the fact that losses are incurred year after year does not necessarily indicate that the prospect of profit is not reasonable or that the taxpayer's intention is not to make a profit. * * * The record in the instant case leaves no room for doubt that petitioner's activities were sufficient to constitute a business, if she had the requisite intention to make a profit from those activities. Our Findings of Fact amply demonstrate that she gave her time, attention, and labor to her horsebreeding activities, and that she also invested considerable amounts of her money therein. Our findings also show that she had made numerous purchases and sales of horses, and that she promoted *154 her sales through a method which she deemed and found to be effective, i.e., exhibiting her horses at shows where she contacted prospective purchasers. The root question in this case is whether petitioner had an intention to make a profit from her activities. We are satisfied that she did. She testified categorically, at several points in the trial, that she had such an intention. And her conduct corroborates this. A mere dilettante, or hobbyist, would not in our opinion, have applied himself so unstintingly, as did petitioner to her horsebreeding activities. The fact of petitioner's continuous losses, while it must be and has been considered by us, is not controlling on the question of her purpose and intention to earn profits, if there was reasonable prospect that she would in the course of time, realize profits. The popularity of and demand for quarter horses, and the prices which they brought on sale, were increasing during the taxable years; and petitioner was at that time developing one of the most popular blood lines in this quarter horse field - all of which gave her a reasonable expectation of ultimately operating at a profit. Besides relying on petitioner's loss experience, *155 respondent has placed considerable reliance upon the facts: (1) That petitioner had in earlier years raised and exhibited horses as a hobby; and (2) that in 1960 she signed an application for an amateur's membership in the American Horse Shows Association, Inc., wherein it was stated that the applicant had not engaged in breeding, buying, selling or dealing in horses, either as a means of support or as a method for substantially increasing her income. Respecting the first of these contentions, petitioner testified at one point that she went into the business in 1946, and at another point that she did so in 1952. As we view the record, the latter date is the correct one; for it was then that she began to make substantial investments in equipment, sought the advice of an accountant as to the necessity for setting up formal books of account, and shortly thereafter substantially increased the size of her herd of horses. Suffice it to say that by 1955 (the first taxable year), she was in our opinion clearly not pursuing a hobby but was conducting a business. Regarding respondent's second contention relating to the statement on the application, there is no gainsaying that it is inconsistent *156 with petitioner's contention in the instant case. But that statement must be weighed against the specific evidence to the contrary herein. This evidence, pointing as it does to petitioner's actual conduct of a business of breeding, buying, selling and dealing in horses with a view to profit, weighs more strongly with us than does a conclusory statement on an application blank, which may have been made without careful consideration. For all the foregoing reasons, we decide the present issue for the petitioner. Because a second issue raised by petitioner in the pleadings was conceded by her at the trial, Decision will be entered under Rule 50. Footnotes
1. Quarter horses are related to so-called thoroughbreds (i.e., racing horses); but they do not have the thoroughbreds' endurance to run at high speeds for long distances. Quarter horses are favored by contestants for riding in rodeos.↩
1. Three of the four horses acquired in 1955 were colts foaled by petitioner's mares. ↩
2. One of the four horses acquired in 1956 was a colt foaled by petitioner's mare. ↩
3. Two of the three horses acquired in 1957 were colts foaled by petitioner's mares.↩