Hofmann Bros. Realty Corp v. Commissioner.
Hofmann Bros. Realty Corp. v. Commissioner
Docket No. 93803.
United States Tax Court
T.C. Memo 1963-320; 1963 Tax Ct. Memo LEXIS 25; 22 T.C.M. (CCH) 1678; T.C.M. (RIA) 63320; December 5, 1963
*25 In 1952 the petitioner, a real estate business run by two brothers, amended its articles of incorporation to allow it to charter boats and engage in other marine activities. A 42-foot fishing boat was purchased, and during the 1953 season it was advertised for public charter with a professional captain supplied. In 1958 another fishing boat was acquired to replace the original one, but in all years from 1953 through 1961 the boats were rented on a part-time basis to only one customer, a manufacturing company of which the same two brothers are officers. The petitioner charged the manufacturing company only for the hours it actually used the boat, and during these years the boat was not advertised for public charter in any way, nor was it ever rented to another customer. Also, the petitioner experienced consistent losses in each year it operated the boats. Held: The petitioner was not engaged in the "trade or business" of chartering fishing boats within the meaning of sections 162(a) and *26 167(a) of the 1954 Code, and expenses incurred in owning and operating such boats are not deductible in either 1958 or 1959. Floyd W. Tompkins, 123 S. Broad St., Philadelphia, Pa., for the petitioner. Dennis C. DeBerry, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The respondent determined deficiencies of $2,938 and $2,103.08 in petitioner's income tax returns for the years 1958 and 1959, respectively. The only issue presented is whether the petitioner is in the "trade or business" of chartering fishing boats within the meaning of sections 162(a) and 167(a) of the Internal Revenue Code of 1954. Findings of Fact
*27 Some of the facts have been stipulated and are so found. The petitioner, Hofmann Bros. Realty Corp., is a Pennsylvania corporation organized in 1951 as a real estate company and authorized to do business in New Jersey. It filed its returns for the years in question on a calendar year basis with the district director of internal revenue in Philadelphia, Pennsylvania. Petitioner's principal business activity was the rental of real estate, and under its articles of incorporation its stated purpose was: Par. 3: To buy, sell, lease, and acquire real property for its own account. In 1952 this was amended to read: Par. 3: The purpose or purposes of the corporation are: To buy, sell, lease, and acquire real property for its own account. To buy, sell, lease, acquire, operate and charter boats, ships, vessels, docks, wharves, piers and marine equipment; provided however, that the corporation shall not engage in any business relative thereto which will require it to be licensed by the Public Utility Commission. To manufacture, process, sell and deal in mechanical packing, gaskets and allied products and personal property of every class and description. At the same time the authorized *28 capital stock was increased from $30,000 to $50,000 divided into 500 shares of common stock with a par value of $100 each. In 1952 the petitioner bought the Witchfin which was a 42-foot off-shore fishing boat. In November of 1957, the petitioner traded the Witchfin in on the Blue Star, a 40-foot off-shore fishing boat, but delivery was not made until May 10, 1958. A $1,000 down payment was made on January 1, 1958, and the balance of $18,739.45 was paid on the date of delivery. The petitioner also owned a small boat, the Garvey, which was bought in 1952 and sold in 1962 at a profit. There is no evidence that it was ever used for commercial purposes, and during 1958 and 1959 it was not rented and was being held for sale. In 1953 the Witchfin was widely advertised for charter use by the general public with a professional captain supplied by the petitioner. During all the other years, from 1952 through 1961, the Witchfin and later the Blue Star were rented only to Fibreflex Packing and Manufacturing Company (hereinafter called Fibreflex), and no captain was supplied. Fibreflex would issue around 60 invitations to its customers each year, and the boat had to be available whenever a *29 customer might wish to use it. The Hofmann brothers, Charles and Joseph, who together owned all of the petitioner's issued stock, acquired stock in Fibreflex in 1955. No other boats, ships, vessels or other marine equipment or property were ever owned or operated by petitioner between 1953 and 1960, and its only income in the years in question was from real estate rental and rental of the Blue Star to Fibreflex. While petitioner made several unsuccessful attempts to acquire marine property between 1952 and 1963 it did nothing otherwise to engage in the business permitted by the 1952 amendments to its articles of incorporation. Prior to 1958 the sole stockholders of petitioner, Charles and Joseph Hofmann, placed their stock in a trust of which they were trustees and which also holds their stock interest in Fibreflex and Reliance Packing Company (hereinafter called Reliance). Charles is the president and treasurer of petitioner and Fibreflex; he is vice president and secretary of Reliance. He is also the manager of Fibreflex which was on a 24-hour production scale seven days a week and required most of his time during the years in issue. Charles' brother, Joseph, is vice president *30 and secretary of petitioner, secretary of Fibreflex, and president and treasurer of Reliance but divides his time solely between Fibreflex and Reliance. The petitioner's books and records are kept in the Fibreflex offices. The income of the Witchfin and the expenses of the Witchfin and the Garvey, prior to the years in question, were as follows: Year
Income
Total Expenses
1952
$ 898.00
$5,052.49
1953
4,479.87
6,546.30
1954
795.56
3,264.00
1955
1,790.55
3,789.02
1956
1,755.75
3,130.29
1957
1,787.50
3,733.98 These expenses include insurance, dockage, depreciation, a captain's fee in 1953, and all the general expenses of operating the boats. The petitioner received income from Fibreflex for the use of the Blue Star in 1958 and 1959 of $1,215 and $1,675, respectively. It claimed expenses for the Blue Star and the Garvey as follows: 1958
1959
Boat Maintenance
$ 3,393.15
$3,343.44
Insurance
617.10
617.10
Dock Rental
255.00
510.00
Depreciation
(10-year useful life)
Blue Star
6,293.24
3,545.00
Equipment
308.90
308.90
Garvey
140.82
140.82
$11,008.21
$8,465.26
The Blue Star was used by Fibreflex on 21 *31 days for 81 hours in 1958 and on 20 days for 112 hours in 1959. Fibreflex paid the petitioner for the use of the Blue Star according to an arrangement whereby Fibreflex was charged only for the hours it actually used the boat. The rental rate in 1958 and 1959 was $15 per hour which was a rate comparable to that charged for similar boats in the area. The fishing season lasts all year, but the charter-boat business lasts only from about June 15 to September 15. Thus, the 90-day charter-boat season is dictated by the vacation period, and, in particular, the season of the Blue Star in the years in question, was limited to the period in which Fibreflex customers would come to the shore. Weather conditions prevented the use of the Blue Star during the season for approximately 14 days in both 1958 and 1959. The Blue Star was also inoperable due to mechanical difficulties of an extraordinary nature for approximately 44 days in the 1958 season and 37 days in the season of 1959. Charles went sport fishing in Florida on several occasions and, in both 1958 and 1959, the Blue Star was used for three days by Charles and Joseph in a marlin tournament. All expenses for the boat's use for these *32 tournaments were paid personally by Charles and Joseph, but petitioner did not receive the $15 per hour rent for this period despite the fact that a Fibreflex business guest was aboard. In all the years except 1953 the boats were captained by Charles Hofmann who had acquired his navigational skill as a boy, but the petitioner did not pay Charles any compensation for his services. Charles operated the boats in either a personal capacity or as an employee of Fibreflex but not of the petitioner. During this period the petitioner did not advertise the Blue Star nor actively hold it out for rent, although it was docked with the boats in the charter fleet. No log was kept of the boat's operations for the years in issue and, as previously mentioned, after 1953 none of petitioner's boats were rented to anyone other than Fibreflex nor were any attempts ever made to effect such rentals. In 1960 and 1961 the hourly rate basis for charging Fibreflex was discontinued, and Fibreflex was charged a flat "cost plus 5 percent" rate. The petitioner had income and expenses from the operation of Blue Star in those years as follows: Income
Total Expenses
1960
$1,140.01
$1,020.97
1961
1,531.71
1,357.92
*33 The petitioner claimed no depreciation on the Blue Star or the equipment for 1960 and 1961. Petitioner was not in the business of renting or chartering boats in 1958 and 1959. Opinion The petitioner contends that it is in the "trade or business" of chartering fishing boats, and consequently it is entitled to deduct the expenses and depreciation in connection with the Blue Star under sections 162(a) and 167(a) of the 1954 Code. The determination of whether a taxpayer is engaged in a trade or business is made upon all the facts and circumstances of each case. Higgins v. Commissioner, 312 U.S. 212 (1941); International Trading Co. v. Commissioner, 275 F.2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court, American Properties, Inc., 28 T.C. 1100 (1957), affirmed 262 F. 2d 150 (C.A. 9, 1958). One fact which is essential to a finding that the taxpayer is engaged in a trade or business is the existence of a profit motive; although it is not necessary that a profit actually be made. American Properties, Inc., supra; Henry P. White, 23 T.C. 90 (1954), affirmed per curiam 227 F. 2d 779 (1955). *34 In the instant case we find that the requisite profit motive was absent. There were no attempts in 1958 or 1959 to charter the Blue Star to the general public, as had been done with the Witchfin in 1953, or to rent her to customers other than Fibreflex at any time after she was acquired. Despite the fact that the Blue Star had to be available for the use of Fibreflex customers, Fibreflex was charged only for the time it actually used the boat. This may have been desirable from the Fibreflex point of view, but it does not indicate a business purpose or profit motive from petitioner's standpoint. It instead suggests the contrary. Lack of business purpose or profit motive by petitioner is also suggested by an analysis of the hours of rental involved in the Fibreflex arrangements during 1958 and 1959. In 1958 Blue Star was out of commission for 44 days and petitioner estimates there were 14 days of bad weather that would have kept her in port. She was therefore available for rent for 768 hours on 32 days in the season. In 1959 Blue Star was out of commission for 37 days, and petitioner again estimates there were 14 days of bad weather. She was therefore available for rent for 936 hours *35 on 39 days in that season. If we cut the available rental hours in half to consider only the minimum number of daylight hours in a summer season, the Blue Star was available for rent for 384 hours in 1958 on 32 days, and for 468 hours in 1959 on 39 days. Under the friendly Fibreflex arrangements, suited to that company's convenience, needs and desires to entertain its customers, the Blue Star was rented for only 81 hours on 21 days in 1958 and for only 112 hours on 20 days in 1959. When this is considered in the light of the nominal hourly rental charged and petitioner's failure even to attempt to secure other customers, lack of a profit motive is glaringly apparent. We can only conclude that unprofitable arrangements were made and maintained with Fibreflex for reasons other than to make money for petitioner. The consistent record of losses also indicates that profit was not expected. Cf. Henry P. White, supra. When these facts are coupled with the fact that the sole stockholders of petitioner were also stockholders and officers of Fibreflex, and one of them was Fibreflex's manager, it becomes clear that the operation of the Blue Star was not premised upon profit to *36 or business purposes of petitioner but rather upon convenience and benefits to Fibreflex and also to Charles Hofmann, its president and manager, who is both a sport fisherman and a life-long boat enthusiast. The petitioner contends that it was engaged in the business of chartering the Witchfin in 1953, and that once a property has been used in a business it is considered to remain in such use until it is shown to have been withdrawn. The cases relied on by petitioner to support this argument are clearly distinguishable on their facts. Without deciding whether the Blue Star is the same property as the Witchfin or even whether the petitioner was engaged in the business of chartering the Witchfin in 1953, we hold that in all events any business of chartering boats which may have pre-existed had long since been abandoned and the petitioner was not engaged in the trade or business of chartering fishing boats in either 1958 or 1959. A mere authorization to engage in marine activities by amendment to articles of incorporation and brief halfhearted efforts in that direction in 1952 and 1953 does not establish a trade or business conducted years later in 1958 and 1959. Nor do petitioner's *37 later unsuccessful inquiries looking toward purchase of marine property convince us that it was in the boat rental business in the years here involved. It is undisputed that the petitioner was engaged in the real estate business, but it is clear that the expenses of the Blue Star were in no way connected with that business. Petitioner has shown no proximate relationship between its real estate business and the expenses of owning and operating a fishing boat. Such expenses are therefore clearly not ordinary and necessary to petitioner's real estate business, and cannot be deducted as such. We do not reach the question of whether Fibreflex would be entitled to deduct the expenses if it had owned the Blue Star. To allow for possible adjustments in accordance with this opinion Decision will be entered under Rule 50.