Paul J. Kelly and Myrtle O. Kelly, et al. [1] v. Commissioner. Kelly v. Commissioner
Docket Nos. 4683-68, 4686-68, 4723-68.
United States Tax Court
T.C. Memo 1970-250; 1970 Tax Ct. Memo LEXIS 112; 29 T.C.M. (CCH) 1090; T.C.M. (RIA) 70250; August 31, 1970. Filed Harold Gondelman and Charles E. Wittlin, 1018 Frick Bldg., Pittsburgh, Pa., for the petitioners in docket No. 4683-68. Edmund W. Ridall, Jr., for the petitioners in docket No. 4686-68. Thomas D. Wright, for the petitioners in docket No. 4723-68. Joseph M. Abele, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: In these consolidated cases respondent determined the following Federal income tax deficiencies and additions to tax against the petitioners: Petitioners
Dkt. No.
Year
Deficiency
Addition to Taxunder Sec. 6653(a) [2]
Paul J. and Myrtle O. Kelly
4683-68
1962
$25,663.92
$1,283.20
1963
2,558.82
William C. and Josephine Trainor
4686-68
1962
6,464.95
J.R. and Catherine N. McCartan
4723-68
1962
1,764.29
1963
2,492.77
*115 1091 The issues for decision are as follows: 1. Whether payments of $10,131.94 and $10,643.51 made to petitioner McCartan in 1962 and 1963 are taxable as (a) gains derived from the sale of a capital asset, or (b) distributions of partnership income under sections 702 and 61, or (c) "payments in liquidation" of a partnership interest under section 736. 2. Whether the termination of Lawrence N. Chamberlin's interest in the partnership of McCartan Kelly & Co. on June 15, 1962, was a "sale" of such interest to the remaining partners under section 741, or whether the transaction should be treated as a "liquidation" by the partnership of Chamberlin's interest under sections 736 and 761(d). 3. Whether the petitioners in docket No. 4683-68 are liable for an addition to tax under section 6653(a) for the year 1962 because Paul J. Kelly erroneously understated his distributive share of income from Kelly Williston and Co. in the amount of $24,201.83 in the calendar year 1962 as a result of his reporting on their income tax return for the calendar year 1962 his distributive share of *116 the partnership's income for the fiscal year ended February 28, 1963, instead of his distributive share for the fiscal year ended February 28, 1962. Findings of Fact Some of the facts and exhibits have been stipulated by the parties and are incorporated herein by this reference. Paul J. Kelly (herein called Kelly) and Myrtle O. Kelly are husband and wife. Their legal residence was Pittsburgh, Pennsylvania, at the time they filed their petition in this proceeding. Their joint Federal income tax returns for the calendar years 1962 and 1963 were filed with the district director of internal revenue at Pittsburgh, Pennsylvania. William C. Trainor (herein called Trainor) and Josephine Trainor are husband and wife. Their legal residence was Pittsburgh, Pennsylvania, at the time they filed their petition in this proceeding. Their joint Federal income tax return for the calendar year 1962 was filed with the district director of internal revenue at Pittsburgh, Pennsylvania. J. R. McCartan (herein called McCartan) and Catherine N. McCartan are husband and wife. Their legal residence was Pittsburgh, Pennsylvania, at the time they filed their petition herein. Their joint Federal income *117 tax returns for the calendar years 1962 and 1963 were filed with the districi director of internal revenue at Pittsburgh, Pennsylvania. McCartan was born on January 24, 1901, and for practically all of his adult life has been engaged in the practice of public accounting. On September 1, 1937, he established a public accounting firm known as J. R. McCartan & Co. with its office at Pittsburgh. McCartan opened branch offices in Wheeling, West Virginia, and Oil City, Pennsylvania, in November and December 1937. In 1940, he acquired an already established public accounting office in Johnstown, Pennsylvania, and continued it as a branch operation. During the early years of operation, McCartan at times had partners, but at least from 1951 to October 1, 1960, he operated the firm as a sole proprietorship. From its inception the firm grew and prospered. In the late 1940's, it had at least 40 employees and gross annual fees in excess of $200,000. On December 25, 1951, McCartan suffered a severe stroke leaving him physically impaired for almost a year. As a result, he was absent from the office and business began to fall off. After about a year, McCartan began to regain his health and *118 was able to return to work and renew his old contacts, thus halting the decline in business. In 1947, McCartan had acquired a half interest in Robert Morris School, now known as Robert Morris College (herein referred to as the school), located in Pittsburgh. The other half interest was owned by certain members of J. K. Lasser & Co. of New York City. [3]
McCartan managed the school until 1956 when his son, Jack, graduated from college and took over the active management thereof. The school's enrollment in 1947 was about 2,300 students. When Jack took over the management, it started to grow rapidly. About that time, the school purchased a five-story building in Pittsburgh and in subsequent years added two floors. It kept growing and eventually acquired a campus in Moon Township, Pennsylvania, on which ten buildings were constructed. 1092 In either 1956 or 1957, after Jack became actively involved with the school, McCartan and his family purchased the remaining stock interest in the school owned by those associated with J. K. Lasser & Co. To finance the stock purchase and the operation of the school, McCartan personally *119 guaranteed bank loans and mortgages in excess of $1,000,000. During this period of time, the late 1950's, both his son Jack and his attorney, John Dougherty, advised McCartan to sell his interest in J. R. McCartan & Co., because of his health and his substantial involvement with the school. Although on two separate occasions, prior to 1960, McCartan considered the possibility of merging his accounting business with two other firms, no merger was consummated. In September 1958 McCartan did sell his accounting practice located in Johnstown, Pennsylvania, to Charles Wessel, a certified public accountant and former employee in charge of that office. Also at about this same time, three employees of J. R. McCartan & Company's Pittsburgh office approached McCartan about the possibility of their purchasing the business from him, but he declined to sell it to them. The business of J. R. McCartan & Co., the sole proprietorship, had a good reputation in Pittsburgh and Western Pennsylvania and was highly regarded by its clients and others with whom it dealt. It had a "good crop of clients," numbering approximately 200 and was one of the largest local accounting practices in Pittsburgh, *120 excluding the national accounting firms. In the early summer of 1960, Robert G. MacAlister (herein called MacAlister), a Pittsburgh attorney acting on behalf of Lawrence N. Chamberlin (herein called Chamberlin) and George W. Robinson (herein called Robinson) contacted McCartan about selling the business of J. R. McCartan & Co. McCartan responded that it would depend on who the prospective purchasers were. After MacAlister indicated that his clients were Chamberlin and Robinson, McCartan agreed to meet and talk to them. Chamberlin at that time was the manager of the Tax Department of the Pittsburgh office of Price Waterhouse & Co. Robinson was then employed by Sharon Steel Corporation. During their ensuing discussions, McCartan made available to Chamberlin and Robinson complete information concerning the clients, fees, salaries and other expenses of his business. After several meetings among the three individuals, they reached an agreement which was reduced to writing in a Memorandum of Agreement dated July 7, 1960. Pursuant to this agreement, McCartan, Chamberlin, and Robinson on September 21, 1960, formally executed an agreement labeled "Partnership Agreement J. R. McCartan & *121 Co." (herein referred to as the September 21 agreement). The agreement, drafted by MacAlister, provided, in pertinent part, as follows: This Partnership Agreement is executed this 21st day of September, 1960, by and between J. R. McCARTAN, GEORGE W. ROBINSON and LAWRENCE N. CHAMBERLIN. WHEREAS, J. R. McCartan has for many years practiced the profession of Public Accounting under the firm name of J. R. McCartan & Co. in the City of Pittsburgh, Pennsylvania and surrounding territories and in the City of Wheeling, West Virginia, and WHEREAS, Robinson and Chamberlin, Certified Public Accountants, have been from time to time engaged in both the private and public accounting profession, in the City of Pittsburgh, Pennsylvania and the City of Sharon, Pennsylvania, and WHEREAS, the parties hereto for the mutual benefits as hereinafter contained desire to associate themselves as a partnership for the professional practice of accounting. NOW, THEREFORE, the parties hereto associate themselves in a partnership under the firm name of "J. R. McCartan & Co., Certified Public Accountants" for the professional practice of accounting under the terms, conditions, rights, privileges and liabilities *122 as hereinafter set forth. ARTICLE I Name, Business and Principal Place of Business A. The partnership shall operate under the name of "J. R. McCartan & Co., Certified Public Accountants." * * * ARTICLE II Term of the Partnership The partnership shall commence on October 1, 1960 and terminate on September 30, 1970. 1093 ARTICLE III Capital of the Partnership A. The original capital of the partnership shall consist of the sum of $50,000.00 contributed equally by Chamberlin and Robinson, in cash, of which sum the amount of $25,000.00 will be contributed on October 1, 1960 and the balance thereof not later than December 1, 1960. The original interests of the partners in the capital of the partnership are as follows: Chamberlin
$25,000.00
Robinson 25,000.00
Total
$50,000.00
B. Any additional capital which may be needed from time to time in the conduct of the partnership shall be contributed equally by Chamberlin and Robinson. Such equal contributions of capital by them may from time to time be waived by either of them, and in the event of such waiver they shall continue to share equally in the profits and losses of the business as herein *123 provided. * * * C. An individual capital account shall be maintained for Chamberlin and for Robinson. The capital interest of each of them shall consist of his original contribution of capital, plus any additional capital contributions and his share of partnership profits, less his share of partnership losses and withdrawals. ARTICLE IV Management of the Partnership: Duties and Restrictions A. Sole control of the management of the firm is vested in Chamberlain and Robinson, hereinafter referred to as Managing Partners. They shall keep McCartan informed in all matters affecting his interest in the "continuing clients" as long as his interest therein exists. * * * ARTICLE V Time Devoted to Partnership Affairs A. The Managing Partners shall devote all of their time to the business of the partnership. * * * ARTICLE VI Work in Progress A. As of September 30, 1960, all work in progress and client expense advances of McCartan * * * shall be transferred to the partnership. Such amounts shall be included in subsequent billings by the partnership to the clients set forth therein. B. From the collections received thereon, there shall first be allocated to McCartan and *124 the partnership the respective out-of-pocket expenses advanced by them for the client, including but not limited to long distance 'phone calls, postage, travel expenses, etc. The balance thereof shall be allocated between McCartan and the partnership in the proportions that McCartan's work in progress determined as of September 30, 1960 and this partnership's cost of work in progress subsequent to September 30, 1960 bears to the total work in progress of each job or client from whom collections are received. Any amount of collections in this respect due McCartan shall be remitted to him by the partnership on or before the 15th day of the month following the month of collection. ARTICLE VII Gross Receipts, Profits or Losses A. The net fees received by the partnership shall be used and/or distributed in the following priorities: 1. * * * As an expense of the operation of the partnership McCartan will be paid $10.00 per hour for all services rendered by him and charged to partnership clients and for all administrative services rendered to the partnership at the request of the Managing Partners. 2. The Managing Partners are each to receive $15,000.00 per year as a drawing *125 account. 3. McCartan is to receive twelve and one-half percent (12 1/2%) of the net fees billed to "continuing clients" for the period of eight (8) years. * * * If for any reason this percentum of billings is deferred, it will continue as a liability of the partnership until paid and said deferred payments will bear interest at the rate of five percent (5%) per annum after due date. All deferred payments must be paid on or before October 1, 1970. For the purpose of this computation and payment, a fiscal year October 1 through September 30 shall be used and the payment shall be made within sixty (60) days thereafter. It is understood and agreed that this provision may be altered and amended by Chamberlin and Robinson so that McCartan will receive not more than twenty-five percent (25%) of the therein stated billings in any one year over a period of four (4) or more years. If, however, this provision is revised to accelerate the payments, the privilege of deferring said payments beyond the due date is rescinded for any year or years in which the acceleration occurs. It being the intent of the parties that McCartan is to receive not more than a total of one hundred percent (100%) of *126 the continued clients' billings spread over a term of not less than four (4) or more than eight 1094 (8) years, not to exceed twenty-five percent (25%), or be less than twelve and one-half percent (12 1/2%) in any one year. 4. The remaining profits to be paid equally to Chamberlin and Robinson. ARTICLE VIII Liabilities A. McCartan will be responsible for all debts and liabilities, incurred or accrued, of J. R. McCartan & Co., Certified Public Accountants, a sole proprietorship, up to and including September 30, 1960. B. The Managing Partners will be responsible for the debts and liabilities of the partnership commencing October 1, 1960, and further agree to indemnify McCartan against any losses suffered by him by reason of his membership in this partnership which may arise subsequent to October 1, 1960. * * * ARTICLE X Insurance A. The Managing Partners will each apply for and keep in force during the term as hereinafter defined the principal sum of $50,000.00 life insurance with the partnership as beneficiary. B. The term of such insurance shall be for so long as any amounts due and payable to McCartan as fees for "continuing clients" under the terms herein *127 contained shall remain unpaid. During such term the face amount of the insurance may be reduced at the option of the insureds to such amount that is equal to the remaining unpaid payments due on account of such "continuing clients." C. The Managing Partners shall not, during the term of the insurance, exercise any of the rights, privileges or options available under said policies in any manner which would reduce or jeopardize the partnership security thereunder. D. In the event of the death of either or both of the Managing Partners during the term the insurance policies are in force, the insurance proceeds received shall be deemed to have been received from the deceased partner by the partnership as a loan. * * * ARTICLE XI New Partners A. New Partners may be admitted by the Managing Partners to the partnership. B. In such case, a Supplemental Agreement, in terms satisfactory to the Managing Partners, shall be executed by all the partners, setting forth: 1. The amount of partnership capital, if any, and the allocation hereof among the Managing Partners and the new partners. 2. The percentage in which the partnership profits and losses shall be thereafter shared or *128 borne. 3. In the event any capital contribution is required of any new partner, such contribution shall be made at the time of his admission. 4. No new partner shall be admitted under any terms, conditions or agreements which would adversely affect the rights or interest of McCartan in the receipt of his payments of the annual percentages of the fees billed to "continuing clients" as hereinbefore set forth in Article VII, so long as such interest of McCartan may continue. ARTICLE XII Retirement or Death of the Non-Managing Partner A. McCartan may retire from the partnership at any time, upon giving written notice to the Managing Partners of his intention to do so. Such retirement shall not accelerate any payments due to McCartan under this Agreement. B. In the event of the retirement of McCartan from this partnership, McCartan agrees that in consideration of the payments due to him under this Agreement providing such payments are either paid in full or are not in default, that he shall comply with the following conditions: 1. The continuing partnership shall have the sole right to the use of the name J. R. McCartan & Co., Certified Public Accounts. 2. All files, documents *129 and records shall be the property of the partnership. 3. McCartan shall not, directly or indirectly, on his own behalf, or in association with others, operate or maintain, during a period of ten (10) years following his retirement, an office for the practice of accounting in the City of Pittsburgh or within a radius of 100 miles thereof. 4. McCartan shall not, during the same period, directly or indirectly, contact on behalf of himself or any other accountants for the purpose of rendering accounting services any of his "continuing 1095 clients" or clients secured by the exclusive efforts of McCartan except where he deems the same reasonably necessary to effectuate the collection of any amounts due him pursuant to the terms of this agreement. 5. It is expressly understood between the parties hereto that none of these restrictions upon the activities of McCartan shall be effective in the event of any defaults in the terms of this Agreement prior to the complete satisfaction of the payments due to McCartan. C. In the event of the death of McCartan and the continuation of the partnership by the Managing Partners, payments due to McCartan under the terms of this agreement will *130 be made to the McCartan Estate. Such payments shall be made to include the following: 1. Payment of any amounts for services rendered by McCartan under the terms hereinbefore set forth. 2. Payment of amounts due to McCartan for "fees billed to continuing clients" as hereinbefore set forth. The surviving partners may, however, notwithstanding the limitations of Article VII, accelerate said payments due on account of "continuing clients" by paying to the McCartan estate a sum sufficient to equal 100% of the average annual continued clients billings for the period commencing October 1, 1960 and ending on McCartan's death, reduced by any amount previously paid on account thereof. D. Upon the payments to the McCartan Estate as set forth in Paragraph C above, the interest of the McCartan Estate in this partnership shall cease and terminate. ARTICLE XIII Withdrawal or Death of a Managing Partner A. Except as provided in Article V no Managing Partner has the right to withdraw from this partnership during its term without the approval of the other Managing Partner and McCartan. In the event such approval has been granted provisions must be made to the complete satisfaction of McCartan *131 for the payment by the partnership to him of any rights which he has under this Agreement. B. Upon the death of any Managing Partner the partnership business shall not terminate but shall be continued as a partnership between the surviving Managing Partner and McCartan. The estate of a deceased partner shall not be deemed a partner except to the extent that payments of a deceased Managing Partner's interest shall be made to the estate under the terms and conditions as set forth in Article XIV. C. The surviving or remaining partners shall have the right to continue to use the name "J. R. McCartan & Co., Certified Public Accounts". D. The withdrawing partner in consideration of the payments to him of his interest in the partnership agrees: 1. Not to contact, directly or indirectly, for the purpose of securing business, any of the known clients of the firm. 2. Not to accept, without the firm's written consent, any business from any of the firm's clients. 3. Not to disclose any information as to the firm's clients or the affairs of said clients. 4. Not to refer to himself for business purposes as "formerly of" or "lately of" the firm. 5. The provision in Paragraph D, 2, *132 above, shall not apply in the event that any of the firm's clients shall inform the firm of his wish to retain the withdrawing partner's services in preference to the services of the firm. 6. These provisions of Paragraph D, above, shall also apply to McCartan in the event of his retirement from the firm as herein provided. E. The withdrawal of a Managing Partner shall be, in any event, permitted only at the end of any partnership year. * * * ARTICLE XVI Dissolution and Liquidation of Partnership A. This partnership shall be dissolved upon the occurrence of any of the following events: 1. The refusal of McCartan to acquiesce in the withdrawal of a Managing Partner. 2. The failure of the partnership to pay to McCartan any of the amounts due to him under the terms of this Agreement, unless McCartan in writing waives his rights thereto. Such rights as held by McCartan shall succeed to the McCartan estate. 3. Upon mutual agreement of all of the partners to dissolve. B. In the event of such dissolution, liquidation of the partnership shall be carried on under the following terms: 1. All partners shall be considered liquidators of the partnership. 2. The partnership *133 shall be liquidated in as short a time as possible under the conditions as existing. 1096 3. Payment in liquidation shall be in the following order: (a) There shall be paid all amounts due to McCartan representing his rights in receiving 100% of the defined annual billings from "continuing clients." In computing this amount, the basis will be 100% of such average annual defined billings for the period commencing October 1, 1960 and ending on the date of dissolution, reduced by any amount or amounts previously paid on account thereof. (b) All the remaining assets of the partnership shall be divided equally between the Managing Partners as determined by the partners' capital accounts, drawing accounts and loans due partners. ARTICLE XVII Possession of Files, Documents and Records Pertaining to Clients A. In the event of the death of a Managing Partner or the retirement of McCartan (providing his interest in the partnership has been fully satisfied) all files, documents and records pertaining to clients shall remain the property and in the possession of the continuing partnership. B. In the event of the termination of the partnership and the liquidation of its assets, *134 all files, documents and records relating to each client shall be delivered to the partner who had the major responsibility for the affairs of that client. In the event of the termination of the partnership and its liquidation at a time when the interest of McCartan has not been satisfied in full, all files, documents and records relating to McCartan's "continuing clients" shall be delivered to McCartan. As of October 1, 1960, McCartan, under the terms of the September 21 agreement, transferred all work in progress in his sole proprietorship to the partnership of J. R. McCartan & Co. Since McCartan had been in the accounting business for over 20 years in the Pittsburgh area, it was decided that his name would be included in the partnership's name and that he would be designated as a partner thereof to insure the continued partonage of existing clients and to protect his interest in the net fees of "continuing clients." [4]
*135 As part of the July 7, 1960, memorandum of agreement, McCartan agreed to sell his physical assets and leases to the partnership for a consideration to be mutually agreed upon. The parties executed a separate bill of sale covering the furniture and fixtures. When the parties entered into the memorandum of agreement of July 7, 1960, it was understood that after a period of six months McCartan would not be able to devote much time to the partnership because of his involvement with the school. [5]
*136 The agreement provided that McCartan was to receive 12 1/2 percent of the net fees billed to "continuing clients" for a period of 8 years. The term "net fees" meant gross fees billed to a client less traveling and other out-of-pocket expenses directly related to that client. It did not mean net 1097 profits of the partnership. The obligation to pay McCartan 12 1/2 percent of the net fees from "continuing clients" existed whether or not the partnership operated at a profit. The basis of the agreement to pay McCartan 12 1/2 percent of the net fees from the continuing clients for a period of 8 years was (1) that McCartan wanted an amount equal to 100 percent of net fees for the business and (2) that the value of an accounting practice for sale, at least as far as Chamberlin was aware, is generally considered to be approximately 100 percent of net fees. The 8 year payout period was "determined largely by the speed at which * * * Robinson and [Chamberlin] felt [they] would be able to make [the] payments." [6]
*137 Chamberlin and Robinson believed that they had the right to operate the business of J. R. McCartan & Co. as long as they made the required payments to McCartan. And as they understood the September 21 agreement, upon completion of the required payments, the two of them would be the sole owners of J. R. McCartan & Co. In a letter dated October 23, 1963, Chamberlin, in attempting to collect a bill from clients of the partnership, stated: This invoice covered services rendered at a time when J. R. McCartan & Company was owned solely by George W. Robinson and Lawrence N. Chamberlin. Under the September 21 agreement, Chamberlin and Robinson had the right to accelerate payments to McCartan but could not pay him more than twenty-five percent (25%) of the net fees in any one year over a period of four or more years and the right to defer the payments so that they could extend as long as 10 years. According to the September 21 agreement, at the end of each fiscal year McCartan was furnished with a list of fees the partnership received from the continuing clients, and it was from this list that the 12 1/2 percent payments were computed. Although he never saw the general books of the *138 partnership, McCartan was permitted to see copies of bills sent to the "continuing clients" to determine if the list supplied him was correct. Such bills were the only records of the partnership seen by him. McCartan was not required by the terms of the September 21 agreement to devote any time to the affairs of the partnership nor to contribute any services thereto. The agreement did provide, however, that he was to receive $10 per hour "for all services rendered by him and charged to partnership clients and for all administrative services rendered to the partnership at the request of the Managing Partners." The partnership, subsequent to October 1, 1960, allowed McCartan to retain the same office that he had occupied previously. He came into the office almost every day to pick up his mail and receive telephone calls. He also discussed the continuation of the work concerning the "continuing clients" with Chamberlin and Robinson. For services rendered to clients and to the partnership, McCartan received amounts, on a yearly basis, ranging from a low of $830 to a high of $3,700. In 1963 such payments amounted to $3,300. McCartan correctly reported on his Federal income tax returns *139 all amounts received on the basis of $10 a hour for services rendered as ordinary income. Since the amount of money McCartan was to receive for his accounting practice was determined as a percentage of fees from "continuing clients," he was greatly concerned with the manner in which the partnership handled such clients. There was considerable dissension between McCartan, on one side, and Chamberlin and Robinson, on the other, over this matter. McCartan frequently complained to Chamberlin and Robinson that he was not consulted, as required by the September 21 agreement, in matters affecting his interest in the "continuing clients." McCartan, in a letter dated June 28, 1961, to Chamberlin, stated: I believed then as I believe now that it is to our mutual interests for me to retain contact with the "continuing clients" and I certainly cannot intelligently do so unless I am, at least, kept informed as to scope and progress of work, points of conflict, billings, etc. I would welcome an open discussion of this point so as to eliminate future misunderstandings. Pursuant to a provision in the September 21 agreement that the managing partners may admit new partners, Chamberlin and Robinson *140 admitted Kelly[7] and Trainor as managing partners of the partnership as of October 1, 1961. The arrangements 1098 leading to the admission of Kelly and Trainor to the partnership were negotiated solely by Chamberlin and Robinson. McCartan was merely asked to approve such action, which he did. At that time a dispute arose between McCartan and Kelly as to whose name was to come first in the company's name. McCartan prevailed and the company's name was changed to McCartan Kelly & Co. A fictitious name registration, dated October 1, 1961, was filed with the office of the Prothonotary for Allegheny County, Pennsylvania, for McCartan Kelly & Co., showing McCartan, Chamberlin, Robinson, Kelly and Trainor as partners. [8]
The supplemental agreement, dated August 3, 1961 (herein referred to as the supplemental agreement) provided that the parties' respective capital contributions, *141 drawing accounts, and shares of profit were as follows: CapitalContribution
Drawing Account
Share inProfits
Kelly
$25,000
$24,000
29.41%
R obinson
25,000
15,000
29.41%
Chamberlin
25,000
15,000
29.41%
Trainor
10,000
15,000
11.77%
The supplemental agreement did not change or alter in any way McCartan's legal relationship with the partnership. Nor did it affect McCartan's right or the partnership's obligation to continue making the payments of 12 1/2 percent of the net fees from the "continuing clients." Except as modified by the supplemental agreement, the September 21 agreement continued in force after August 3, 1961. Pursuant to the September 21 agreement, McCartan received $10,131.94 in 1962 and $10,643.51 in 1963, which amounts represented the 12 1/2 percent payments. Termination of Chamberlin's Interest in the Partnership Because of the continuous and increasing dissension among the parties, there was considerable discussion beginning early in 1962 regarding the possible termination of Chamberlin's interest in the partnership. In a telephone conversation on January 13, 1962, Chamberlin asked McCartan if he (McCartan) was interested *142 in buying his interest in the partnership. Shortly thereafter, Kelly, Trainor, and McCartan in a letter dated February 27, 1962, made Chamberlin "an offer to acquire [his] partnership interest." Another offer was made by Kelly and Trainor in a letter dated May 5, 1962, "for [Chamberlin's] withdrawal from the firm as of April 30, 1962." None of these offers were accepted. At some time between the end of February or the first of May 1962, Robinson announced his intention to withdraw from the partnership. McCartan refused to acquiesce to Robinson's proposed withdrawal and called a meeting to dissolve the partnership. At a meeting on May 29, 1962, among Kelly, Trainor, McCartan, Robinson, and Chamberlin, it was decided that the dissolution of the partnership would not be in the best interest of all concerned, and an alternative solution to Chamberlin's withdrawing from the partnership was considered. With respect to his proposed withdrawal from the partnership, Chamberlin negotiated with McCartan as to the right to solicit the business of McCartan's "continuing clients," and with Kelly and Trainor as to the amount of money he was to receive for his interest in the partnership and *143 the right to solicit partnership personnel to work for him. As of May 29, 1962, Robinson had definitely decided to leave the partnership and return to work for Sharon Steel Corporation. For this reason, Chamberlin did not negotiate with Robinson at all. Robinson did, in fact, terminate his interest in the partnership as of June 1, 1962. Throughout the negotiations, the parties referred to Chamberlin's proposed termination of his interest in the partnership as a withdrawal. Language of "purchase" or "sale" was not used. At the conclusion of the May 29 meeting, the parties drafted an agreement captioned: "WITHDRAWAL AGREEMENT - L. N. CHAMBERLIN FROM FIRM OF McCARTAN KELLY & Co. This agreement, in pertinent part, provided: Chamberlin agrees to withdraw from the firm of McCartan Kelly & Co. effective June 15, 1962, upon the signing of an agreement on May 31, 1962, under the following terms and conditions: 1. Kelly and Trainor will pay to Chamberlin $45,000 on June 15, 1962. * * * 7. It is undestood by all parties that this agreement is completely contingent upon Kelly & Trainor executing an 1099 agreement with J. R. McCartan in connection with his continuing clients and the *144 continuance of McCartan Kelly & Co. as it presently exists prior to the signing of this agreement. This document was signed by Kelly and Trainor and initialed by Robinson, McCartan and Chamberlin. According to the terms of this agreement, Kelly and Trainor were to meet with McCartan on May 31 in an attempt to reach an agreement as to the "continuing clients" and the continuance of the firm. If they were successful, then the instrument was to be given to attorneys "for drafting into a legal document which presumably was to have been signed on May 31." Another meeting was held on May 31 among Kelly, Trainor, McCartan, and Chamberlin. Although Chamberlin did not arrive at the meeting until 6:00 p.m. when it was terminating, he had been represented throughout by his attorneys Robert G. MacAlister and Gilbert E. Morcroft. Kelly and Trainor were represented by the same attorney, John Metz, and McCartan was represented by Dougherty. On either June 1 or 2, the parties executed a document captioned "WITHDRAWAL AGREEMENT." This agreement, dated May 31, 1962, provided, in pertinent part, as follows: THIS AGREEMENT made this 31st day of May, 1962, by and between J. R. McCARTAN, PAUL *145 J. KELLY, WILLIAM C. TRAINOR, GEORGE W. ROBINSON, and LAWRENCE N. CHAMBERLIN. * * * 1. LAWRENCE N. CHAMBERLIN shall withdraw from the firm of McCartan Kelly & Co. on and as of June 15, 1962, upon the terms hereinafter set forth, which are in lieu of the terms of any and all agreements heretofore entered into between any of the parties hereto * * *. 2. The sum of Forty-Five Thousand ($45,000.00) Dollars shall be paid to Lawrence N. Chamberlin by McCartan Kelly and Co. on June 15, 1962, otherwise this agreement shall be void. * * * 5. Receivables and work in progress of J. R. McCartan & Co. as of September 30, 1961, are acknowledged as not being assets of McCartan Kelly & Co., and proper distribution, as illustrated in the partnership agreement of September 21, 1960, will be made to Lawrence N. Chamberlin and George W. Robinson by the firm on subsequent realizations on these accounts. This agreement was signed by McCartan, Kelly, Trainor, Robinson and Chamberlin. In a letter dated May 31, 1962, Chamberlin wrote Robinson as follows: In view of the fact that you commenced employment at Sharon Steel Corporation on June 1, 1962, and, therefore, withdrew from the firm of McCartan *146 Kelly & Co. by this action, I wish to advise you that it is my understanding that Paul J. Kelly and William C. Trainor will be responsible for the payment of the $45,000 due me on June 15, 1962, under the terms of our agreement dated May 29, 1962, and formally drafted May 31, 1962, for my withdrawal on June 15, 1962. There is no liability from you to me with respect to this $45,000 payment. In addition to Chamberlin, Kelly and Trainor also signed this letter. The agreement of May 31, 1962, was the operative instrument under which Chamberlin terminated his interest in the partnership. Chamberlin was aware, prior to his signing the agreement, that it provided that he was to be paid $45,000 by McCartan Kelly & Co. [9]
On June 15, 1962, Chamberlin received a check in the amount of $45,000 drawn on McCartan *147 Kelly & Co. The partnership borrowed the funds to pay Chamberlin from the Mellon National Bank & Trust Co. In granting the loan, the bank required financial statements of the partnership, but was not concerned with the financial condition of the individuals negotiating the loan. The loan was guaranteed by Kelly and Trainor and their wives. McCartan was not liable in any capacity on the loan. For the period from January 1, 1962, to June 15, 1962, Chamberlin also received withdrawals of $6,875. The balance in Chamberlin's capital account in the partnership as of January 1, 1962 was $8,302.43. For the period beginning January 1, 1962, to June 15, 1962, McCartan Kelly & Co. had ordinary income of $28,222.77, prior to 1100 any distributions to McCartan, computed on the cash receipts method of accounting. Section 6653(a) Addition To Tax Asserted Against Petitioner Kelly for the Calendar Year 1962 From its inception in 1946 until 1962, Kelly Williston and Co. filed its Partnership Return of Income (From 1065) on the basis of a fiscal year ending February 28. Kelly, who was a partner of Kelly Williston and Co. for the year 1962, reports his income on a calendar year basis. During *148 this period, Kelly, who admittedly is "very familiar with the reporting of income and expenses on a fiscal year basis," was jointly responsible for preparing the tax returns for Kelly Williston and Co.
For the fiscal year ended February 28, 1962, Kelly's distributive share of ordinary income and capital gains of Kelly Williston and Co. was $30,951.41 and $185.11, respectively. On his Federal income tax return for the calendar year 1962, Kelly erroneously reported only $6,749.58 and $1,002.92 as his distributive share of ordinary income and capital gains from Kelly Williston and Co. for the fiscal year ended February 28, 1962. In computing his taxable income for the calendar year 1962, Kelly erroneously took the figures from the Kelly Williston and Co. partnership return for the fiscal year ended February 28, 1963, which showed his distributive share of the partnership's ordinary income and capital gains to be $5,746.65 and $1,002.92, respectively. [10] As a result of his taking the partnership figures for the fiscal year ended February 28, 1963, instead of those for the fiscal year ended February 28, 1962, Kelly understated his taxable income for the calendar year 1962 in the amount *149 of $24,201.83. Opinion 1. Tax consequences of the 12 1/2 percent payments received by petitioner McCartan in 1962 and 1963: The Agreement of September 21, 1960. We first consider whether payments of the 12 1/2 percent of the net fees from "continuing clients" to McCartan pursuant to the September 21 agreement represent (a) gains derived from the sale of a capital asset, or (b) distributions of partnership income under sections 702 and 61, or (c) "payments in liquidation" of a partnership interest under section 736. On his Federal income tax returns for the years 1962 and 1963, McCartan reported the payments as gain from the sale of a capital asset. Such payments were treated on the partnership returns for the appropriate years as distributive shares of partnership income to McCartan under section 702, *150 with the result that a substantial portion thereof reduced Kelly and Trainor's distributive shares of partnership income for the fiscal years ended February 28, 1962, and February 28, 1963. In order to protect the revenue, respondent took inconsistent positions in the notices of deficiencies sent to the respective petitioners. In the notice of deficiency to McCartan, respondent "determined [without stating any reasons therefor] that [McCartan] received ordinary income pursuant to the provisions of section 61 of the Internal Revenue Code from McCartan Kelly and Company in calendar years 1962 and 1963 * * * rather than a long-term capital gain as included in [his] returns in the amounts of $10,131.94 and $10,643.51, respectively." In the notices of deficiencies to Kelly and Trainor, respondent determined that there was a "sale" of McCartan's accounting practice to the partnership, composed of Chamberlin and Robinson, thus disallowing the deductions in respect thereof from the partnership's income for its fiscal years ended February 28, 1962, and February 28, 1963. As a consequence, there were corresponding increases in the distributive partnership income *151 of Kelly and Trainor for the respective fiscal years which were reflected in the deficiencies determined for the calendar years 1962 and 1963 with respect to each of them. The real controversy herein regarding the payments to McCartan is not between the various parties and the respondent, [11] but rather between McCartan, on the one side, and Kelly and Trainor on the other. We hold, in favor of McCartan, that he sold his 1101 accounting practice to the partnership consisting of Chamberlin and Robinson. McCartan contends that he sold his accounting firm of J. R. McCartan & Co. to Chamberlin and Robinson on September 21, 1960; that he was never a partner of J. R. McCartan & Co., which subsequently became McCartan Kelly & Co.; and that the 12 1/2 percent payments represent the gain derived from the sale of capital asset, i.e., the intangible assets of his accounting business. Kelly argues that McCartan was a partner of McCartan Kelly & Co. and that all sums received by him were distributions of partnership earnings. Trainor argues substantially the same as Kelly, except that *152 the 12 1/2 percent payments to McCartan represent guaranteed payments under section 707(c) [12] and are deductible by the partnership as ordinary and necessary expenses of doing business. The September 21 agreement, in form at least, created a partnership among Chamberlin, Robinson and McCartan. There is no doubt that a partnership was formed with Chamberlin and Robinson as partners. The crucial question, however, is whether McCartan was, in substance, a partner of J. R. McCartan & Co., which subsequently gave rise to a sale by McCartan of the intangible assets of his accounting practice to Chamberlin and Robinson. Section 761(a) defines a partnership as including "a syndicate, group, pool, joint venture, or other unincorporated organization through *153 or by means of which any business, financial operation, or venture is carried on, which is not * * * a corporation or trust or estate." [13] And a partner is succinctly defined as "a member of a partnership." Section 761(b). Under this rather broad definition, there may be a partnership for Federal income tax purposes even though there is no partnership as a matter of State law. [14] See Willis, Handbook of Partnership Taxation, p. 3 (1957); see also Delores Crabb, 41 B.T.A. 686, 696 (1940); E. G. Wadel, 44 B.T.A. 1042 (1941). Whether the arrangement among McCartan, Chamberlin, and Robinson constituted a partnership with McCartan as a partner under section 761(a) and 7701(a) (2), and the regulations promulgated thereunder, is a question of fact to be determined from all existing circumstances. Hubert M. Luna, 42 T.C. 1067, 1077-1078 (1964); Beck Chemical Equipment Corporation, 27 T.C. 840 (1957); Wm. J. Lemp Brewing Co., 18 T.C. 586 (1952). Thus, the pivotal *154 question is whether McCartan intended to, and did in fact, join together with Chamberlin and Robinson for the present conduct of an undertaking or enterprise. Hubert M. Luna, supra at 1077. Several objective factors have been listed as significant in determining an individual's intention to become a partner. [15] In the landmark case of Commissioner v. Culbertson, 337 U.S. 733, 742-743 (1949), the Supreme Court found the following factors important: The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard * * * but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which 1102 it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. These factors are equally relevant to the determination *155 of all types of partnerships for Federal tax purposes. Culbertson was a family partnership *156 case, but the general principles set out therein apply to all partnership situations. Smith's Estate v. Commissioner, 313 F. 2d 724, 728-729 (C.A. 8, 1963); Edward C. James, 16 T.C. 930, 939 (1951), affirmed per curiam, 197 F. 2d 813 (C.A. 5, 1952); Isadore Louis Rosenberg, 15 T.C. 1, 8 (1950). Whether or not McCartan was associated with Chamberlin and Robinson as a partner depends on the application of these legal principles. After a careful examination of the entire record in light of these principles, we conclude that McCartan was never, in substance, a partner in the firm of J. R. McCartan & Co., or its successor McCartan Kelly & Co. A. Representation of Partnership Status to Others Both Kelly and Trainor, in arguing that McCartan was a partner, emphasize the facts that the September 21 agreement was captioned "PARTNERSHIP AGREEMENT" and that it specifically provided that the parties thereto desired "to associate themselves as a partnership." They also rely heavily on McCartan's statements in various letters that he considered himself as having a partnership interest in the business. To be sure, such manifestations by McCartan *157 are some evidence of his intention, but we attach little significance to them under the peculiar facts and circumstances involved herein. The formal execution of articles of partnership does not necessarily create a partnership for Federal income tax purposes. See John P. Denison, 11 T.C. 686 (1948), affd. 180 F. 2d 938 (C.A. 6, 1950), certiorari denied 340 U.S. 817 (1950). It is well settled that "neither local law nor the expressed intent of the parties as to the legal nature and effect of their * * * agreements are conclusive as to the existence or nonexistence of a partnership * * * for Federal tax purposes." Haley v. Commissioner, 203 F. 2d 815, 818 (C.A. 5, 1953); Solomon v. Commissioner, 89 F. 2d 569 (C.A. 5, 1937), affirming 34 B.T.A. 723 (1936). Nor do we think it significant that McCartan, because he represented himself, or permitted himself to be represented, as a partner, may have been held liable under the law of Pennsylvania as a "nominal" or "ostensible" partner to anyone dealing with the partnership upon such representation, as if he were an actual partner. See Pa. Stat. Ann. Tit. 59 38 *158 (1964). B. Contribution of Capital or Services Another factor which courts consider important in determining whether an individual is a partner is the contribution to, and ownership of capital in, the partnership. Edward C. James, 16 T.C. 930 (1951), affd. 197 F. 2d 813 (C.A. 5, 1952); Grant v. Commissioner, 263 F. 2d 558 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court. The September 21 agreement required Chamberlin and Robinson to each make a capital contribution of $25,000 to the partnership. But McCartan was not required to contribute any capital; nor did he, in fact, contribute any. Capital accounts were maintained for Chamberlin and Robinson, but there was no provision for a capital account for McCartan. Although the rendition of services has been recognized as sufficient to support the status of a partner, McCartan, unlike Chamberlin and Robinson, was not required to devote any time or energy to the business of the partnership. Cf. W. H. Simmons, 22 B.T.A. 1106 (1931). At the time the parties entered into the September 21 agreement, it was contemplated that McCartan after about six months would be so *159 involved with the Robert Morris school that he would have little time to devote to the business of the partnership. The September 21 agreement imposed the requirement on Chamberlin and Robinson to reasonably devote their time and energy to the business. In contrast, McCartan was not so required. We recognize that McCartan did render services to the partnership and its clients, but these services were rendered more in the capacity of an employee of the partnership for which he was compensated at the rate of $10 per hour. While Kelly and Trainor introduced evidence to show that McCartan was at his 1103 office practically every day and performed certain services, they made no showing that he performed such services in any capacity other than as employee, or that he was not adequately compensated therefor under the agreement. While the other interested parties might have considered McCartan's actions with respect to the partnership as nothing more than burdensome intermeddling, we view them as consistent with his status as (1) an employee or (2) a seller of the accounting business, interested in the "continuing clients." Indeed, McCartan's actions are clearly understandable in light *160 of the fact that the amount of money McCartan was to receive depended on the fees received from such "continuing clients." Likewise, McCartan's participation in the decisions concerning the withdrawals of Chamberlin and Robinson, as well as the hiring of key personnel, is consistent with his desire to protect his interest in the "continuing clients." We realize that whether or not the September 21 agreement was a contract of sale of McCartan's accounting practice depends primarily upon the intent of the parties at the time the agreement was executed. Oesterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955). But we think it is clear from all the evidence herein that the parties intended the agreement to serve a two-fold purpose: (1) as a contract of sale of McCartan's accounting practice to the partnership, and (2) as a partnership agreement between Chamberlin and Robinson. The record shows that the negotiations leading up to such agreement were predicated on the notion of McCartan selling his business to Chamberlin and Robinson. It is uncontroverted that MacAlister, acting for Chamberlin and Robinson, approached McCartan to see if he wanted to sell his accounting *161 business. Furthermore, we construe the agreement to provide that all right and title to the accounting business would pass to the "purchaser" upon the full payment of a definitely determinable amount of money, which consisted of the 12 1/2 percent payments. Chamberlin candidly testified that the total amount of money that McCartan was to receive from the partnership was determined on the basis of 100 percent of net fees of the business, that such amount was what McCartan wanted for his business, and that such amount was generally considered the value of an accounting business for purposes of a sale. [16] Of particular significance is Chamberlin's testimony that the eight year pay-out period was "determined largely by the speed at which * * * Robinson and [he] felt [they] would be able to make [the] payments." These facts are indicative that the parties intended the agreement to be a contract of sale so far as McCartan was concerned. *162 C. Mutual Control of the Business Generally, all partners have equal rights in the management and conduct of the partnership business. J. Roland Brady, 25 T.C. 682 (1955). But under the September 21 agreement, "[sole] control of the management of the firm is vested in Chamberlin and Robinson."[Emphasis added.] McCartan only had the right to be consulted on matters affecting his interest in the "continuing clients" as long as his interest therein existed. D. A Sharing of Profits and Losses Another factor in determining whether an individual is a partner is whether he has the right to share in profits. John W. Graham, 8 B.T.A. 1081 (1927); Samuel J. Lidov, 16 B.T.A. 1421. McCartan had no proprietary interest in the profits of the partnership. Under the September 21 agreement he had (1) the right to $10 an hour for any services he rendered and (2) the right to the 12 1/2 percent payments. In his capacity as an employee and a seller of the accounting business, McCartan did not have to look to the profits of the partnership for payment. The partnership's obligation to make such payments 1104 was fixed regardless of whether it operated *163 at a profit. Moreover, McCartan was not required to sustain any losses of the business. The September 21 agreement was explicit that Chamberlin and Robinson were obligated to "idemnify McCartan against any losses suffered by him by reason of his membership in [the] partnership which may arise subsequent to October 1, 1960." This is another factor strongly militating against characterizing McCartan as a "partner" of the business. Roland P. Place, 17 T.C. 199 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952). In short, McCartan had no mutual interest in the capital of the partnership, no control of its general business, no proprietary interest in its profits, and no ultimate liability for its lossess. [17] Under these circumstances we conclude that McCartan's relation to the business after October 1, 1960, was not that of a partner. 2. Termination of Chamberlin's interest in McCartan Kelly & Company: *164 The Agreement of May 31, 1962. We next consider whether Chamberlin made a "sale of his partnership interest to Kelly and Trainor under section 741, [18] as contended by respondent, or whether the payment of $45,000 to Chamberlin is to be regarded as "made in liquidation" of his interest within section 736, [19] as contended by Kelly and Trainor. Chamberlin treated the transaction as a "sale" and reported the proceeds therefrom as a capital gain on his Federal income tax return for 1962. Kelly and Trainor, on the other hand, had the partnership treat the payment as having been "made in liquidation" of Chamberlin's interest under section 736. *165 While there may be little, if any, difference in the ultimate economic effect between a "sale" of a partnership interest to the remaining partners and a "liquidation" of that interest by the partnership, drastic differences in tax consequences result to the withdrawing partner and the remaining partners depending upon the form in which the transaction is cast, i.e., a "sale" or a "liquidation." See David A. Foxman, 41 T.C. 535 (1964), affd. 352 F. 2d 466 (C.A. 3, 1965), which contains a clear, comprehensive review of the legislative reasons for the divergent tax treatment for a "sale" as opposed to a "liquidation" of a partnership interest. The legislative history of Subchapter K makes it plain that Congress intended the withdrawing partner and the remaining partners to have some freedom to determine with relative certainty their respective tax burdens by negotiations. David A. Foxman, supra.It is just as plain that Congress did not intend sections 736 and 741 to be a license to "whipsaw" the respondent in such a manner that the parties are successful in treating the transaction inconsistently for Federal income tax purposes. See e.g., Miller v. United States, 181 Ct. Cl. 331, 20 A.F.T.R. 2d 5569, 1967); *166 and Charles F. Phillips, [Dec. 26,088], 40 T.C. 157 (1963). Both Miller and Phillips involved the same transaction, but the Court of Claims in Miller held that it was a "sale" under section 741 with the result that the withdrawing partner was allowed to treat the proceeds received for his partnership interest as capital gain and the Tax Court held that the transaction was 1105 a section 736 "liquidation" with the result that the remaining partner's distributive share of partnership income was reduced accordingly. We find that the documentary evidence and the testimony of the parties are somewhat confusing as to the factual circumstances surrounding Chamberlin's withdrawal from the partnership. However, it is noteworthy that Chamberlin, Kelly and Trainor - as practicing certified public accountants for many years - each had extensive knowledge of Federal income taxation. They knew, or should have known, the significance for Federal income tax purposes of the negotiations and the agreement resulting in the termination of Chamberlin's interest. Consequently, the inference is strong that the confusion and the ambiguous nature of the August 31 agreement were not the *167 result of ignorance or oversight, but were intentional. "Wherever an attempt is made by statute to permit flexibility in tax consequences, the possibility arises for tax avoidance through unintended uses of the statutory pliancy." Willis, Handbook of Partnership Taxation, p. 14. It is indeed unfortunate where, as here, taxpayers having expertise in the field of Federal taxation abuse the freedom which Congress permits them in determining the tax consequences of business transactions by obscuring such transactions in confusion and ambiguity. The cost and risk of this litigation could have been prevented if the parties had set out in the agreement the particular section of the Internal Revenue Code they intended to govern tax consequences of their actions. See Willis, supra at p. 538. While this issue is not entirely free from doubt, we conclude, as best we can, from an examination of the August 31 agreement and the other pertinent surrounding circumstances, that the termination of Chamberlin's interest in the partnership constituted a liquidation of such interest under the provisions of section 736. The May 31, 1962, agreement stated "Chamberlin shall withdraw from the firm of McCartan *168 Kelly & Co. 0n and as of June 15, 1962." It further stated that "[the] sum of Forty-Five Thousand ($45,000) Dollars shall be paid to * * * Chamberlin by McCartan Kelly & Co." "There is not a single phrase which usually accompanies a sale, such as 'does hereby transfer, set over, bargain, sell, assign and convey.'" Andrew O. Stilwell, 46 T.C. 247, 250 (1966). See also David A. Foxman, supra; Charles F. Phillips, supra; Virgil L. Beavers, 31 T.C. 336 (1958); and B. Howard Spicker, 26 T.C. 91 (1956). [20]
Similarly, throughout the negotiations leading up to the agreement, the language of sale was not used. Chamberlin readily acknowledged that "at the meeting of May 29, the words 'purchase' and 'sale' *169 were probably not even used." Surely, Chamberlin was aware of the complexities and operation of sections 736 and 741 since he had been the manager of the Tax Department for Price Waterhouse & Co., one of the leading national accounting firms. Yet he did not insist on the use of language in the agreement signifying that a "sale" of his interest was being made to Kelly and Trainor as individuals. It is clear from Chamberlin's testimony that he was aware of the wording of the agreement before he signed it. He was aware that it provided that the firm of McCartan Kelly & Co. was to pay him $45,000. This fact supports our conclusion of a liquidation since the tentative agreement of May 29 indicated that Kelly and Trainor were going to pay Chamberlin $45,000. Although there is no evidence as to why the parties changed the language of the agreement making the partnership, rather than Kelly and Trainor, the payor, it remains that such a change was knowingly made and agreed to by the parties and may not be disregarded by us. Another factor indicating that the transaction was a liquidation was that Chamberlin was paid by a check drawn on the partnership. David A. Foxman, supra. *170 The partnership borrowed the funds with which to make the payment from Mellon National Bank and Trust Company. Although Kelly and Trainor, along with their wives, had to guarantee the loan, McCartan Kelly & Co. was the borrower and as such was primarily liable therefor. In reaching our conclusion, we realize that there is some evidence - such as the failure to make the partnership a party to the May 31 agreement, the failure on the part of Kelly and Trainor to sign the 1106 agreement in a representative capacity, and the letter from Chamberlin to Robinson stating that Kelly and Trainor were responsible for the $45,000 payment - tending to support a finding that the transaction was a sale rather than a liquidation. But in our opinion the evidence as a whole preponderates in favor of a liquidation, and we so hold. 3. The section 6653 addition to tax against petitioner Kelly for the calendar year 1962. Finally, we consider whether Kelly is liable for an addition to tax under section 6653 (a) [21] because he understated his taxable income for the calendar year 1962 in the amount of $24,201.83 as a result of having used the figures from the partnership return of Kelly and Williston *171 for the fiscal year ended February 28, 1963. Respondent's determination of negligence has the benefit of a presumption of correctness and must be upheld unless the taxpayer can show due care. Kelly argues that the omission of $24,201.83 from his taxable income in 1962 was the result of "an honest misunderstanding of fact" and that the addition to tax for negligence should n0t be imposed. We disagree. We think the facts herein are strikingly similar to those in American Properties, Inc., 28 T.C. 1100, 1116 (1957), affirmed per curiam 262 F. 2d 150 (C.A. 9, 1958), where we held that the errors of the accounting firm representing the taxpayer "in failing to *172 determine the proper amount of salary income * * * because of the confusion arising by virtue of the difference between the fiscal years of the corporations and of the petitioners" constituted negligence within the meaning of section 293(a) of the Internal Revenue Code of 1939, the predecessor of section 6653(a). As we view the record, Kelly's position is weaker than the taxpayer's position in American Properties, Inc., because in that case the mistake was made by his agent. We do not suggest that Kelly, in understating his taxable income for the year 1962, acted in bad faith. There is no question here of his good faith. As we said in American Properties, Inc., supra at 1116: "Wholly aside from the question of good faith, a taxpayer may be guilty of negligence requiring the imposition of an addition to tax on account of negligence." See also Evans v. Commissioner, 235 F. 2d 586 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. Negligence, for purposes of section 6653 (a), has been defined as the lack of due care in failing to do what a reasonable and ordinarily prudent person would do under the circumstances. Marcello v. Commissioner, 380 F. 2d 499, 506 *173 (C.A. 5, 1967). The fact that Kelly and the partnership operated on the basis of different taxable years is not a valid excuse for the failure to exercise due care. American Properties, Inc., supra at 1117. Therefore, we conclude that Kelly failed to exercise due care within the meaning of section 6653 (a) when he did not report the figures from the proper partnership return. He is thus liable for the addition to tax. To reflect the conclusions reached herein, Decisions in all dockets will be entered under Rule 50. Footnotes
1. The following cases are consolidated herewith: William C. Trainor and Josephine Trainor, docket No. 4686-68; J. R. McCartan and Catherine N. McCartan, docket No. 4723-68.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. The school was apparently incorporated at some point.↩
4. McCartan evidenced such an intention in two letters written to Chamberlin. In a letter, dated June 7, 1961, he wrote: I entered into a partnership agreement with Lawrence N. Chamberlin and George W. Robinson on September 29, 1960, under the name of J. R. McCartan & Co. This agreement was to continue for a term of ten years and was definite as to the partners, term, name and rights of the partners in case of breach, default, termination, etc. In another letter, dated June 28, 1961, he wrote: I entered into our agreement September 21, 1960, in good faith and in the belief that I was affiliating with two outstanding accountants who would carry on a business that I had spent over 20 years full time in developing. Nothing has happened that leads me to believe otherwise at this time. Unfortunately, however, several things have arisen causing me to believe that there is a serious misunderstanding as to the role I am to play in the partnership. I have surrenderd "operational control" but I have not surrendered my interest in my clients nor do I intend to do so until I am fully compensated therefor. To maintain this interest and to enable me to secure new clients (to compensate me for any of the old that might be lost, as well as to advance your interests) I must be considered as having a partnership interest. Office space in the proposed new quarters must be available to me and telephone calls and mail directed to me must be referred to me promptly. I assure you that I am not acting purely from selfish motives. I have great pride in what J. R.McCartan & Co. has accomplished and what it has meant, and means, in the business world. My prime interest is in seeing this partnership grow and I will do anything within reason to further said growth.↩
5. It is clear from the following testimony that this was Chamberlin's understanding: Q. [Wright] Was it intended at the time the agreement was entered into with Mr. McCartan that he would be available to perform much in the way of services to the new partnership? A. [Chamberlin] We intended that he would be available to perform services. I don't know at the time that we had any idea of how extensive those services might be. Q. Is it not true that it was contemplated at that time that after a period of six months Mr. McCartan would be so involved with Robert Morris School that he would have little time to devote any energy to the partnership? A. That is what Mr. McCartan told us. Q. And that is the basis on which you entered into the agreement? A. That is correct.↩
6. At another point, Chamberlin testified: Q. [McCartan's counsel] Why was the payout spread over 8 years? A. [Chamberlin] I think the main reason was that Mr. Robinson and I did not think that we could make the payout in any shorter time.↩
7. The record is vague on this point, but apparently Kelly's admission as a partner was in connection with the merger of J. R. McCartan & Co. and Kelly Williston and Co.Williston withdrew from the merged businesses. ↩
8. The record does not show who caused the fictitious name registration to be filed.↩
9. On cross-examination Chamberlin testified: Q. [Kelly's counsel] As a matter of fact, didn't you insist on the fact that in paragraph two of the withdrawal agreement it says, "The sum of $45,000 shall be paid to Lawrence N. Chamberlin by McCartan Kelly & Co. on June 15, 1962, otherwise this agreement shall be void" - that is what it says? A. [Chamberlin] Yes sir.↩
10. There is no explanation in the record as to why Kelly apparently included the capital gain of $1,002.92 twice in the computation of his taxable income for 1962. The capital gain of $1,002.92 was included as a part of his distributive share of partnership ordinary income ($5,746.65 + $1,002.92 = $6,749.57) and again on Schedule D, line 6, of his return as a capital gain.↩
11. For the first time on brief the respondent has undertaken to support McCartan's position.↩
12. Sec. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP. * * * (c) Guaranteed Payments. - To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a)↩ (relating to gross income) and section 162(a) (relating to trade or business expenses).
13. Section 7701(a)(2) contains essentially this same definition. ↩
14. For this reason we think McCartan places undue reliance on the law of Pennsylvania.↩
15. In the Luna case we indicated that the following factors were relevant, though not necessarily conclusive, in determining whether a joint venture exists for tax purposes: The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a perdentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.↩
16. Q. [McAartan's counsel] How was the 12 1/2 percent of the net fees arrived at which - how was the 12 1/2 payment over eight years arrived at? A. [Chamberlin] It was arrived at first by determining the total amount of money which McCartan eventually wished to get from the business. The specific term was determined largely by the speed at which Mr. Robinson and I felt we would be able to make these payments. Q. What was the amoun that Mr. McCartan wanted for his business? A. 100 percent of net fees. Q. Is that a general rule of thumb for purchasing an accounting practice? * * * A. As far as I know from experience and from what is written on the subject, the value of an accounting practice is generally considered to be somewhere in the neighborhood of 100 percent of net fees. It can be slightly more. It can be slightly less, depending upon the profitability of the practice.↩
17. In contrast to McCartan, both Chamberlin and Robinson made joint contributions of capital and services for the purpose of carrying the accounting business, possessed "sole control of the management," and shared the profits and losses of the business.↩
18. SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value). ↩
19. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered- - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard too the income of the partnership. (b) Payments for Interest in Partnership. - (1) General Rule. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a).↩
20. With respect to the first issue herein, we did not consider the absence of language of "sale" or "purchase" in the September 21 agreement of particular importance on the resolution of that issue because the question was whether McCartan was, in the first instance, a partner of the business. However, when the issue is whether there is a section 736 liquidation or a section 741 sale, this factor assumes great weight.↩
21. SEC. 6653. FAILURE TO PAY TAX. (A) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩